CITIZENS ASSOCIATION OF GEORGETOWN the COMMITTEE OF 100 ON the FEDERAL CITY,

v.

Walter E. WASHINGTON, Commissioner of the District of Columbia, et al., Appellants.

No. 74–2086.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 16, 1975.

Decided May 25, 1976.

---

David Eisenberg, Asst. Corp. Counsel, District of Columbia, Washington, D. C., with whom C. Francis Murphy, Corp. Counsel, Louis Robbins, Principal Asst. Corp. Counsel and John C. Salyer, Asst. Corp. Counsel, Washington, D. C., were on the brief, for appellants.

Bruce J. Terris, Washington, D. C., with whom Suellen T. Keiner, Washington, D. C., was on the brief, for appellees. Burton A. Schwalb, Washington, D. C., entered an appearance for appellee The Georgetown Inland Corp.

* Sitting by designation pursuant to Title 28, U.S. Code Section 292(d).

Before McGOWAN and LEVENTHAL, Circuit Judges, and JAMES B. McMILLAN,* United States District Judge for the Western District of North Carolina.

PER CURIAM:

This appeal involves only the propriety of an award by the District Court of attorneys' fees to plaintiffs-appellees, whose complaint was dismissed after hearing on the merits. 383 F.Supp. 136 (1974).

In October of 1972, the Maloney Concrete Corporation obtained a construction permit from the District of Columbia for an office building with an underground garage in the Georgetown area. In August of 1973, the Georgetown-Inland Corporation obtained a permit to construct an office building with an underground garage in the same area. Both garages were to have ventilation systems that would remove automobile exhaust fumes and emit them to the surrounding air.

Plaintiffs-appellees filed this suit seeking to enjoin the corporate defendants from further construction of the projects and to require the District of Columbia officials named as defendants to prohibit continued construction on the projects until air quality permits had been obtained.[1] Appellees premised these claims for relief on two theories: first, the emissions from the ventilation systems and the increased automobile traffic needed to transport people to and from the developments would prevent the District of Columbia from attaining by 1977 and maintaining thereafter the relevant national primary air quality standards promulgated under the Clean Air Act; and, second, the construction violated a provision of the District's air quality implementation plan requiring the issuance of an air quality permit prior to the construction of a "stationary source" of air pollution in the District.

The District Court concluded, after trial on the merits of the claim for permanent

1. A motion for a preliminary injunction was denied on January 2, 1974, 370 F.Supp. 1101 (1974).

injunctive relief, that (1) the corporations were not in violation of an "emission standard or limitation" as defined by the Clean Air Act, (2) the District of Columbia's regulation for "stationary sources" was not applicable to emissions from underground garages, and (3) the appellees failed to demonstrate that the projects would interfere with attainment of the applicable air quality standards by 1977.

Appellees then filed a motion to amend the judgment to include an award of attorneys' fees of approximately $13,000 against the District on the theory that the "various actions and failures to act [by the government officials] have been the principal cause of the present litigation." The District Court granted the motion. 383 F.Supp. at 143–46.

We can affirm the award of attorneys' fees against the District of Columbia only if the District Court had jurisdiction under the citizen suit provision of the Clean Air Act. As the District Court apparently recognized, and as counsel for the Association acknowledged in oral argument before us, jurisdiction under 28 U.S.C. § 1331 will not support a claim for attorneys' fees. *Alyeska Pipeline Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *see NRDC v. EPA*, 168 U.S.App. D.C. 111, 512 F.2d 1351, 1361 (1975) (Wright, J. dissenting).

Section 304(d) of the Clean Air Act specifically provides that "in issuing any final order *in any action brought pursuant to subsection (a) of this section,* [the District Court] may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate." 42 U.S.C. § 1857h–2(d) (1970) (emphasis added). As the italicized language indicates, the Act authorizes fees only in actions under subsection (a), which provides in relevant part:

[A]ny person may commence a civil action on his own behalf (1) against any person (including (i) the United States, and (ii) any other government instrumentality or agency to the extent permitted by the

Eleventh Amendment to the Constitution) *who is alleged to be in violation of (A) an emission standard or limitation under this chapter* or (B) an order issued by the Administrator or a State with respect to such a standard or limitation

.   .   .   .

*Id.* § 1857h–2(a) (emphasis added). Since no "order" of the kind contemplated in clause (B) was involved in this case, the only remaining question is whether the complaint alleged that the District violated "an emission standard or limitation."

■ Appellee's complaint did not allege that any facility of the District of Columbia was emitting pollutants into the air, but only that the District failed to insist on preconstruction review of private buildings with large parking facilities. The complaint alleged that the planned private buildings would pollute the environment, but the claim with respect to the District of Columbia was based on its alleged failure to insist on preconstruction review in order to assure compliance with the timetable for attainment of national air quality standards in the District.

■ After reviewing the legislative history of the citizen suit provision, it is our conclusion that an allegation that a government instrumentality *has failed to enforce* the Clean Air Act does not satisfy the statutory requirement that the government instrumentality be alleged to be in violation of "an emission standard or limitation." Although early versions of the legislation gave the district courts jurisdiction over civil actions "for  .  .  .  enforcement, *or to require such enforcement,*" whenever a government instrumentality was alleged to be in violation of "*any  .  .  .  provision*" of the Act, *see* Senate Committee on Public Works, 91st Cong., 2d Sess. § 304(a)(1) Committee Print No. 1 (1950) (emphasis added), *reprinted in* Environmental Policy Division of the Congressional Research Service, A Legislative History of the Clean Air Amendments of 1970, at 704 (1974) [hereinafter cited as Legislative History], the enacted version limited federal jurisdiction over suits against a governmental instru-

mentality to those alleging a violation of an emission standard or limitation, or of an order issued by the Administrator of the EPA or by a State with respect to an emission standard or limitation. And the legislative history surrounding the evolution of those limitations quite clearly indicates that section 304(a)(1) confers federal jurisdiction only over suits against *polluters*, and, under certain conditions, the Administrator of the EPA.[2]

For example, in the course of the floor debate in the House over the version of the Act that emerged from the Conference Committee, Congressman Staggers noted that section 304 of the Act would permit citizen suits "against *polluters* as well as against the Administrator." 116 Cong.Rec. 42520 (1970), *reprinted in* Legislative History, *supra*, at 112 (emphasis added). Similarly, Senator Muskie's summary of the key provisions of the Conference version of the Act emphasized that the "conference agreement authorizes citizen suits *against polluters to abate violations of any emission limitation under the Act. . . . Any polluter, including a government agency, is subject to suit* after sixty days [sic] notice from the citizen plaintiff." 116 Cong.Rec. 42386 (1970), *reprinted in* Legislative History, *supra*, at 136 (emphasis added).[3]

Although the question whether section 304(a)(1) encompasses suits against state officials for failure to enforce the provisions of the Clean Air Act has not previously been squarely presented to this court, another panel had an opportunity to comment on the meaning of that section in the course of analyzing the citizen suit provision of the Water Pollution Control Act Amendments of 1972, which was modeled on the parallel provision of the Clean Air Act. *NRDC v. Train*, 166 U.S.App.D.C. 312, 510 F.2d 692 (1975). After reviewing the legislative history of section 304, this court said that "[section 304] was designed to provide a procedure permitting any citizen to bring an action directly *against polluters violating the performance standards and emission restrictions imposed under the law . . . ." Id.* at 700 (emphasis added). It emphasized that, although section 304 was a broad measure intended to facilitate the citizen's role in enforcing the Clean Air Act, "Congress did not fling the courts' door wide open. . . . [The citizen suit provision] was hedged by limitations—*the confinement to clear-cut violations by polluters . . . ." Id.* (emphasis added.).[4]

This limitation on district court jurisdiction over citizen suits was accomplished by authorizing civil actions only against persons (including government instrumentalities) "who [are] alleged to be in violation of an emission standard or limitation under this chapter . . . ." Clean Air Act § 304(a)(1)(A), 42 U.S.C. § 1857h–2(a)(1)(A) (1970). For the purposes of the citizen suit provision, "emission standard or limitation" is defined to include (1) an emission standard, (2) an emission limitation, (3) a schedule or timetable for compliance, and (4) a standard of performance. Clean Air Act § 304(f)(1), 42 U.S.C. § 1857h–2(f)(1) (1970).[5]

---

2. Section 304(a)(2) of the Clean Air Act, which is not at issue in this case, provides federal jurisdiction over suits by citizens against the Administrator of the EPA "where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator." 42 U.S.C. § 1857h–2(a)(2) (1970).

3. We do not mean to imply that it was the intent of Congress in earlier versions of the enacted legislation to authorize district court jurisdiction over actions such as the one before us. The language of the early versions may be consistent with that interpretation, but the language and legislative history of the enacted version are not. *See, e. g.*, S.Rep. No. 91–1196, 91st Cong., 2d Sess. 36–37 (1970), *reprinted in*

Legislative History, *supra*, at 437 ("Authorizing citizens to bring suits for violations of standards should motivate governmental agencies charged with the responsibility to bring enforcement and abatement proceedings."); *id.* at 65, *reprinted in* Legislative History, *supra*, at 465 (citizens must give notice to the appropriate enforcement agency "[b]efore instituting a citizen action to abate a violation.").

4. Relevant portions of the legislative history of the citizen suit provision of the Clean Air Act are reproduced as an appendix to the court's opinion. 510 F.2d at 721–31.

5. Section 304(f)(2) also defines "emission standard or limitation" to include "a control or

The enumerated items were intended as "objective evidentiary standard[s] [which] would have to be met by the citizen who brings an action under [the citizen suit provision]." S.Rep. No. 91–1196, 91st Cong., 2d Sess. 36 (1970), *reprinted in* Legislative History, *supra*, at 436. The determination of whether a government instrumentality or other "person" is a polluter for purposes of section 304 was to be made against these objective standards, which were to be "settled in the administrative procedure leading to an implementation plan or emission control provision." *Id., reprinted in* Legislative History, *supra*, at 436. Congress expressly intended that an alleged violation not involve "reanalysis of technological or other considerations at the enforcement stage." *Id., reprinted in* Legislative History, *supra*, at 436.

Even a liberal reading of the complaint indicates that it is nowhere alleged that the District was in violation of an emission standard or limitation as so defined. The District was not alleged to be in violation of an *emission standard,* which the EPA defines as "a regulation (or portion thereof) setting forth an allowable rate of emissions, level of opacity, or prescribing equipment or fuel specifications that result in control of air pollution emission." 40 Fed.Reg. 46247 (1975). Nor was it alleged that the District violated an *emission limitation,* which appellees, quoting *NRDC v. EPA,* 489 F.2d 390, 394 n. 2 (5th Cir. 1974), *rev'd on other grounds,* 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975), consider to be

> an inclusive term, referring to any type of control to reduce the amount of emissions into the air. This includes, of course, "emission standards", but it also includes a number of regulatory devices. These range from regulations directing *sources of emissions* to cease or curtail operations to regulations specifying limits on the sulfur content of fuel that fuel-burning *emission sources* may burn; "transportation controls" designed to reduce the use of motor vehicles, either

prohibition respecting a motor vehicle fuel or fuel additive." 42 U.S.C. § 1857h–2(f)(2)

through the development of mass transit systems, or through traffic control devices, commuter taxes, gasoline rationing, or parking restrictions; and the imposition of emission charges or *other economic incentives aimed at inducing parties to reduce their emissions voluntarily.* (Emphasis added).

The complaint nowhere alleges that the District violated a specific control measure in an applicable implementation plan designed to reduce the amount of pollutants *the District* emitted into the air.

Nor do we think that the complaint can be read to allege that the District was in violation of a *compliance schedule,* which the EPA defines as "the date or dates by which a source or category of sources is required to comply with specific emission limitations contained in an implementation plan and with any increments of progress toward such compliance." 40 C.F.R. § 51.-1(p) (1975).

Finally, we think it is clear that the complaint did not allege that the District was in violation of *standards of performance,* which are actually emission standards for new stationary sources and hazardous air pollutants. *See* 40 C.F.R. § 60.2(c) (1975) (new stationary sources); *id.* at § 61.02(*o*) (hazardous air pollutants); *e. g., id.* at § 60.-42 (standard for particulate matter for fossil-fuel fired steam generators, a stationary source); 40 Fed.Reg. 48302 (1975) (standard for mercury, a hazardous air pollutant). The District was not alleged to be operating a new stationary source or a source emitting a hazardous air pollutant as those terms are defined by the EPA. In fact, as the District Court found, even the private corporations were neither operating a "stationary source" nor emitting a hazardous air pollutant.

We do not, thus, confuse the question of jurisdiction with that of the merits when we conclude that the District Court did not have jurisdiction over the District of Columbia defendants under the citizen suit provision of the Clean Air Act. We need

(1970). This pollution source category is not involved in the case before us.

not address the arguments with respect to whether the District of Columbia had a regulation governing preconstruction review of large parking facilities or whether it was under an obligation to promulgate such a regulation.[6] In either event, the failure of the District of Columbia to prohibit construction of these developments does not make the District a "polluter" for purposes of section 304 of the Clean Air Act.

At the same time, we note that our conclusion does not leave the public without a remedy when a state fails to meet its responsibilities under the Clean Air Act. If a state fails to submit an implementation plan, submits an inadequate plan, or fails to enforce its implementation plan, the Administrator of the EPA has statutory authority to implement corrective measures. Clean Air Act, §§ 110(c), 113(a)(2), 42 U.S.C. §§ 1857c–5(c)(1), 1857c–8(a)(2) (1970); *District of Columbia v. Train*, 172 U.S.App.D.C.

6. For a discussion of the controversy concerning promulgation of regulations for preconstruction review of parking facilities in the District, *see NRDC v. EPA*, 154 U.S.App.D.C. 384, 475 F.2d 968 (1973) (No. 72–1522), *as modified*,

311, 521 F.2d 971, 983–86 (1975). Moreover, a private citizen may seek relief in a federal court based on a jurisdictional grant other than section 304, such as 28 U.S.C. § 1331 (which the District Court held to be a head of jurisdiction here but which affords no authority to award attorneys' fees), or in a state court based on an appropriate jurisdictional grant. Indeed, the citizen suit provision explicitly provides that "[n]othing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any emission standard or limitation *or to seek any other relief (including relief against the Administrator or a State agency)*." 42 U.S.C. § 1857h–2(e) (1970) (emphasis added). *See NRDC v. Train, supra*, 510 F.2d at 701–03.

For the reasons stated hereinabove, the award of attorneys' fees must be reversed.

*It is so ordered.*

March 12, 1973, July 26, 1973, October 23, 1973, November 8, 1973, and November 30, 1973. *See also* Energy Supply and Environmental Coordination Act of 1974, § 4(b), 42 U.S.C. § 1857c–5(c)(2) (Supp. IV, 1974).