LEAGUE TO SAVE LAKE TAHOE, INC., a California Membership Corporation, Claudia Corum, Donna Atherton, Hilton Atherton, Jerry Feldmiller, Marilyn Feldmiller, Mark Litz, John McCauley, John Callister, Bruce Bohlman, Delta Mack, Phil Hannifan, Janet Hannifan, and Jeff Harry, Appellants,

v.

Roger S. TROUNDAY, Director of the Nevada Department of Human Resources, State of Nevada, Nevada Department of Human Resources, Oliver Kahle, and Ted Jennings, Respondents.

No. 77–2058.

United States Court of Appeals, Ninth Circuit.

June 15, 1979.

Joseph J. Brecher, Oakland, Cal., for appellants.

Breen, Young, Whitehead & Hoy, F. R. Breen, Reno, Nev., Stephen C. Balkenbush, Deputy Atty. Gen., Carson City, Nev., John J. Frankowich, Reno, Nev., Robert List, Atty. Gen., Matthew H. Feiertag, Deputy Atty. Gen., Carson City, Nev., McDonald, Carano, Wilson, Bergin & Bible, Reno, Nev., for respondents.

Before BARNES and CHOY, Circuit Judges, and BARTELS,* District Judge.

* The Honorable John R. Bartels, United States District Judge for the Eastern District of New York, sitting by designation.

**BARTELS, District Judge:**

This appeal presents two principal issues: (1) whether federal jurisdiction exists to review a state administrative determination to issue a registration certificate for a proposed indirect source of air pollution rendered pursuant to provisions of the Nevada state implementation plan, and (2) if so, whether appellants' contention that such administrative determination was erroneous states a cause of action upon which relief may be granted. League to Save Lake Tahoe, Inc., ("League") and others appeal from the judgment and order of the United States District Court for the District of Nevada, Thompson, *J.,* granting appellees' motion to dismiss the complaint under Rule 12(b) of the Federal Rules of Civil Procedure. Appellants instituted this action under section 304 of the Clean Air Act (hereinafter cited as the "Act"), 42 U.S.C. § 1857h–2(a) (subsequently amended and recodified as 42 U.S.C.A. § 7604 (West Supp.1979)), and under the federal question statute, 28 U.S.C. § 1331(a), seeking declaratory and injunctive relief to prevent the construction of two hotel-casinos on the south shore of Lake Tahoe at Stateline, Nevada.

Located within the 500 square mile Tahoe Basin, Lake Tahoe is a mountain lake of exceptional beauty, bordered on its western shore by California and on its eastern shore by Nevada. It is approximately 190 square miles in size, 1,645 feet in depth, and is renowned for its pristine clarity and scenic appeal. Because of its proximity and accessibility to the metropolitan areas of northern California and western Nevada, Lake Tahoe has rapidly become one of the most popular resort areas in the far western United States. Inevitably, however, with this increasing popularity comes the danger of serious environmental pollution, not only of the lake itself but of the Tahoe Basin and High Sierra Mountains of which the lake is a part. Mitigation of that danger is the motivating basis for this action.

Appellant League is a privately-funded non-profit membership corporation, organized under the laws of California and dedicated to protection of the environment in the Tahoe Basin, where many of its members live and work. The League is joined by thirteen individual residents of the area who allege that they will be personally injured as a result of the violations alleged in the complaint.[1] Appellees are Roger Trounday, Director of the Nevada Department of Human Resources, who is the state official charged with the duty of carrying out the air pollution laws of Nevada; the Nevada Department of Human Resources, the designated state air pollution control agency for purposes of the Act; and Oliver Kahle and Ted Jennings, owners and operators of the Hotel Oliver and the Tahoe Palace Hotel, respectively, both of which are the focus of the complaint.

■■ Appellants charge that certain administrative actions of the state appellees and construction of the hotel-casinos by the individual appellees violate relevant provisions of the Act and Nevada's state implementation plan. Although numerous issues are raised by this appeal, we conclude that the complaint was properly dismissed by the district court for failure to state a claim upon which relief may be granted, and, accordingly, we affirm.[2]

---

1. The individual appellants are Donna Atherton, Hilton Atherton, Bruce Bohlman, John Callister, Claudia Corum, Jerry Feldmiller, Marilyn Feldmiller, Janet Hannifan, Phil Hannifan, Jeff Harry, Mark Litz, Delta Mack, and John McCauley. They allege that the diminution of the value of their property and the increased costs of health care due to the violations alleged in the complaint will exceed $10,000 for each of them.

2. In reaching this conclusion, we find without merit appellees' contention that this action be dismissed as moot. In support of their claim, appellees cite (1) the enactment by the Nevada legislature of Nev.Rev.Stat. § 445.493(2), providing for the expiration in 1977 of that state's authority to review new complex sources; (2) the indefinite suspension by the U.S. Environmental Protection Agency ("EPA") of federal indirect source regulations on July 3, 1975 (40 Fed.Reg. 28064); and (3) the elimination by Congress through the Clean Air Act Amendments of 1977, Pub.L. 95–95 (hereinafter cited as the "1977 Amendments"), of EPA's authority to require inclusion of indirect source provisions in state implementation plans.

I

Because the factual basis of this action as set forth in the complaint is included in the opinion of the district court at 427 F.Supp. 1350, it is unnecessary here to provide more than a summary of the essential background. Pursuant to section 109(b)(2) of the Act, 42 U.S.C. § 7409(b)(2), the Environmental Protection Agency ("EPA") is required in order to protect the public health to promulgate national primary ambient air quality standards for various air pollutants, including carbon monoxide ("CO"). As appears at 40 C.F.R. § 50.8, EPA has promulgated such standards for CO as follows: 35 parts per million ("ppm") for a one-hour period and 9 ppm for any eight-hour period. To achieve these levels, each state is mandated under § 110(a) of the Act, 42 U.S.C. § 7410(a), to adopt a "plan which provides for implementation, maintenance, and enforcement" of the ambient air quality standards and to submit its implementation plan to EPA for approval. Included in each plan must be, *inter alia,* "emission limitations, schedules, and timetables for compliance with such limitations, and such other measures as may be necessary to insure attainment and maintenance" of the ambient air quality standards. 42 U.S.C. § 7410(a)(2)(B). If the plan submitted meets the substantive and procedural criteria specified in § 110, EPA must approve it.

The state of Nevada submitted its implementation plan to EPA, and the portion thereof relating to the primary ambient air standard for CO was approved and accepted. 40 C.F.R. § 52.1472. The portion of the plan relevant to this appeal concerns the pre-construction issuance of "registration certificates" or "permits" for "complex [or indirect] sources of air pollution." Nev.Air Qualify Reg. § 3.2.2. Briefly stated, the hotel-casinos here involved are classified as "indirect" or "complex" sources because, by virtue of the automobile traffic they will attract, they have or solicit

> secondary or adjunctive activity which emits or may emit any air contaminant for which there is an ambient air quality standard, notwithstanding that such property or facility may not itself possess the capability of emitting such air contaminants. Complex sources include, but are not limited to (a) highways and roads; (b) parking facilities . . .; (d) recreation, amusement, sports, or entertainment facilities.

Nev.Rev.Stat. § 445.446(2). Under § 13.1.1 of the Nevada air quality regulations, the owner of a proposed new complex source is required to apply to the Director of the Department of Human Resources for a registration certificate and must submit an environmental evaluation of the project.[3] If the environmental evaluation shows, or if the Director determines, "that the source will prevent the attainment and maintenance of the State and national ambient air quality standards or will cause a violation of the applicable control strategy contained

---

These developments are rendered irrelevant, however, by § 110(d) of the Act, which provides that the applicable state implementation plan is the "[plan] or most recent revision thereof, which has been approved . . . or promulgated." 42 U.S.C. § 7410(d). EPA has approved no revision of the applicable Nevada state implementation plan suspending the provisions relevant to this appeal, nor has any postponement been granted under § 110(f) of the Act. Until Nevada's unilateral suspension of its indirect source review provisions is approved by EPA, we must consider effective the complex source regulations incorporated in the plan. *See Union Electric Co. v. Environmental Protection Agency,* 427 U.S. 246, 96 S.Ct. 2518, 2523 n. 3, 49 L.Ed.2d 474 (1976); "Approval and Promulgation of Implementation Plans: Connecticut Revision," 44 Fed.Reg. 5427–29 (Jan. 26, 1979); *see also* 123 Cong.Rec. S13704

(daily ed. Aug. 4, 1977) (statement of Senator Muskie that § 110(a)(5)(A)(iii) "does not affect in any way" an indirect source program contained in a state plan already approved by EPA). Thus, we conclude that this action is not moot.

**3.** Only those new complex sources specified in § 13.2 of the Nevada air quality regulations are subject to this registration requirement. That provision states, in pertinent part:

> 13.2 The following new complex sources . . . shall apply for registration certificates in accordance with this Article.
> 13.2.1 New parking areas or facilities or other new complex sources with associated parking areas or facilities with capacities of 1,000 motor vehicles or more.
>
> *     *     *     *     *     *

in the approved Air Quality Implementation Plan," the Director is prohibited from issuing a registration certificate. Nev.Air Quality Reg. § 13.1.3.

On August 12, 1974, appellees Kahle and Jennings submitted separate applications for registration certificates for proposed new hotel-casinos. The facility proposed by Kahle required 33,512 square feet of casino floor space, 960 hotel rooms, and parking for 2400 cars, and that proposed by Jennings required 32,350 square feet of casino floor space, 560 hotel rooms, various convention and theater facilities, and parking for 1600 cars. After initially rejecting both applications upon his finding that the planned construction would violate ambient air standards for CO, appellee Trounday found, based on revised applications incorporating substantial changes in the plans, that the facilities would not violate the standards, and, accordingly, he issued the requested certificates on May 19, 1975 and April 15, 1975, respectively, which issuance was subject to administrative review by the Nevada Environmental Commission pursuant to various provisions of the Nevada state implementation plan.[4]

Rather than resorting to this state administrative remedy, appellants instead demanded that the certificates be withdrawn, asserting that their issuance was an abuse of discretion because the technical analysis upon which the action was taken "did not take into account the situation that would occur under the most adverse meteorological conditions and failed to consider CO levels within the project areas." Upon appellants' request, officials of the state Department of Human Resources then "recalculated expected CO levels within the hotel grounds under adverse conditions using the same methodology that had been employed to assess the applicants' environmental analyses," and found, according to appellants, that the results indicated substantial violation of the CO standards.

When state officials did not comply with the demand to withdraw the certificates, appellants brought this action, claiming that because construction of the facilities would cause violations of the ambient air quality standards for CO cited *supra*, defendants had not complied with § 3.2.2 of the Nevada air quality regulations requiring a valid certificate, and further, that this constituted a violation of an emission standard or limitation within the meaning of § 304 of the Act. Accordingly, they sought a declaration that the certificates are invalid and an order restraining construction until valid certificates could be issued. Upon defendants' motion to dismiss the complaint, the district court dismissed the action on March 10, 1977, and this appeal followed.

II

The question of federal jurisdiction has been raised by all parties. Appellants contend that jurisdiction is appropriate under § 304(a) of the Act—the citizen suit provision—because the Nevada indirect source review provisions cited *supra* governing new complex sources fall within the broad definition of "emission limitation" set forth in *Natural Resources Defense Council v. Environmental Protection Agency,* 489 F.2d 390, 394 n. 2 (5th Cir. 1974), *rev'd on other grounds sub nom. Train v. Natural Resources Defense Council,* 421 U.S. 60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975), and *Citizens Association of Georgetown v. Washington,* 383 F.Supp. 136, 140 (D.D.C.1974), and quoted with approval by this court in *City of Santa Rosa v. Environmental Protection Agency,* 534 F.2d 150, 154 (1976); *cf. Kennecott Copper v. Train,* 526 F.2d 1149 (9th Cir. 1975).[5] More precisely, appellants

---

4.  See note 12 *infra*.

5.  The explanation of "emission limitation" by the Fifth Circuit Court of Appeals in *Natural Resources Defense Council v. Environmental Protection Agency,* 489 F.2d 390, 394 n. 2 (1974) *rev'd on other grounds sub nom. Train v. Natural Resources Defense Council,* 421 U.S.

60, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975), is as follows:

> ["Emission limitation"] is an inclusive term referring to any type of control to reduce the amount of emissions into the air. This includes, of course "emission standards", but it

assert that the "substantive emission limitation" violated here is the principle that new complex sources may not be built if traffic associated with them will cause violations of the ambient air quality standards.

Section 304(a) of the Act states in pertinent part as follows:

(a) [A]ny person may commence a civil action on his own behalf—

(1) against any person (including . . any other governmental instrumentality or agency to the extent permitted by the Eleventh Amendment to the Constitution) who is alleged to be in violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation.

\* \* \* \* \* \*

The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an emission standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be.

At the time this action was instituted, subsection (f) of this section defined "emission standard or limitation" as:

(1) a schedule or timetable of compliance, emission limitation, standard of performance or emission standard, or

(2) a control or prohibition respecting a motor vehicle fuel or fuel additive, which is in effect under this Act (including a requirement applicable by reason of Section 118) or under an applicable implementation plan.

The term "emission limitation" as defined in this provision has generally been interpreted to include only specific restrictions on the composition of pollutants which may be emitted into the air from a particular source or class of sources. In *Train v. Natural Resources Defense Council,* 421 U.S. at 79, 95 S.Ct. at 1481, the United States Supreme Court described emission limitations as

regulations of the composition of substances emitted into the ambient air from such sources as power plants, service stations, and the like. They are the specific rules to which operators of pollution sources are subject, and which if enforced should result in ambient air which meets the national standards.

The *per curiam* opinion of the District of Columbia Circuit Court of Appeals in *Citizens Association of Georgetown v. Washington,* 175 U.S.App.D.C. 356, 358–59, 535 F.2d 1318, 1320–21 (1976), concluded that by enacting § 304 "Congress did not fling the courts' door wide open" but confined jurisdiction to "clear-cut violations by polluters." Most pertinent to the factual situation presented by this appeal, however, is the decision of the Supreme Court in *Hancock v. Train,* 426 U.S. 167, 197, 96 S.Ct. 2006, 2021, 48 L.Ed.2d 555 (1976), where the Court drew a distinction between substantive requirements such as "a schedule or timetable of compliance, emission limitation, standard of performance or emission standard" and all other state implementation plan measures, including the state permit procedure there in issue.[6] Strictly ap-

---

also includes a number of regulary (sic) devices. These range from regulations directing sources of emissions to cease or curtail operations to regulations specifying limits on the sulfur content of fuel that fuel-burning emission sources may burn; "Transportation controls" designed to reduce the use of motor vehicles, either through the development of mass transit systems, or through traffic control devices, commuter taxes, gasoline rationing, or parking restrictions; and the imposition of emission charges or other economic incentives aimed at inducing parties to reduce their emissions voluntarily.

6. In *Hancock v. Train,* 426 U.S. 167, 96 S.Ct. 2006, 48 L.Ed.2d 555 (1976), the Court held state permit requirements for new air contaminant sources inapplicable to federal facilities under § 118 of the Act, 42 U.S.C. § 7418. In discussing the intended scope of § 118 and its relationship to § 304, the Court stated:

[We] find it significant that § 304(f) extends the enforcement power only to "a schedule or timetable of compliance, emission limitation, standard of performance or emission standard," and not to all state implementation [plan] measures.

\* \* \* \* \* \*

plied, these restrictive definitions of "emission standard or limitation" might effectively foreclose appellants' contention that the indirect source permitting procedure alleged to have been violated in this case is an "emission limitation," and, were there no subsequent amendments of the Act, we would be compelled in this case to find no jurisdiction under § 304.

In August 1977, however, after Judge Thompson's decision had been rendered, subsection (f) of § 304 was amended as part of the Clean Air Act Amendments of 1977, Pub.L. 95–95 (hereinafter cited as the "1977 Amendments"), and again in November 1977 as part of the Safe Drinking Water Amendments of 1977, Pub.L. 95–190, and the following paragraph added in further definition of "emission standard or limitation":

> (3) any condition or requirement of a permit under part C of subchapter I of this chapter (relating to significant deterioration of air quality) . . ., any condition or requirement of section 7413(d) of this title (relating to certain enforcement orders), . . ., *any condition or requirement under an applicable implementation plan relating to transportation control measures, air quality maintenance plans,* vehicle inspection and maintenance programs or vapor recovery requirements . . . *which is in effect under this chapter . . . or under an applicable implementation plan.* (Emphasis added.)

The congressional expansion of subsection (f) of § 304 through the 1977 Amendments explicitly broadened federal jurisdiction to include alleged violations of any condition or requirement of a state implementation plan relating to "transportation control measures, [or] air quality maintenance plans." Although the scope of these terms as they are used in this paragraph has not been conclusively defined, we believe, based on our analysis of the amendments and their legislative history, that "indirect source review programs" are properly included within the meaning of the term "transportation control measures." *Accord, Environmental Study and Protection v. Pac, et al.,* 464 F.Supp. 143 (D.Conn.1978).[7]

This finding is supported by certain other indications of congressional intent which, taken together, are persuasive. First, § 110(a)(2) of the Act suggests various measures which the Administrator of EPA may require as part of a state implementation plan, "including, but not limited to, transportation controls, air quality maintenance plans, and preconstruction review of direct sources of air pollution . . ." With respect to the definition of transportation controls, the following caveat was added in subparagraph (5)(E) of section 110(a) of the Act as part of the 1977 Amendments: "For purposes of this paragraph and paragraph 2(B), the term 'transportation control measure' does not include any measure which is an 'indirect source review program.'"[8] This caveat makes explicit con-

---

[W]e cannot credit the argument that § 118 was intended to impose on federal installations any broader duty to comply with state implementation [plan] measures than specified in § 304. The absence in § 304 of any express provision for enforcing state permit requirements in federal court is therefore too substantial an indication that congressional understanding was that the "requirements" federal facilities are obliged to meet under § 118 did not include permit requirements to be overcome by assertions to the contrary. *Id.* at 197–99, 96 S.Ct. at 2021.

7. Although the court in *Environmental Study and Protection v. Pac et al.,* 464 F.Supp. 143 (D.Conn.1978), relied primarily on the phrase "air quality maintenance plan" in finding jurisdiction under § 304, it suggested that the indi-

rect source review program there in issue could also be characterized as a "transportation control measure." For reasons stated *infra,* we believe that an indirect source review program is properly included within the term "transportation control measures."

8. An "indirect source review program" is defined in § 110(a)(5)(D) of the Act as follows:
(D) For purposes of this paragraph the term "indirect source review program" means the facility-by-facility review of indirect sources of air pollution, including such measures as are necessary to assure, or assist in assuring, that a new or modified indirect source will not attract mobile sources of air pollution, the emissions from which would cause or contribute to air pollution concentrations—

gressional intent that the Administrator not be authorized to require inclusion of indirect source review provisions in state implementation plans. H.R.Rep. No. 294, 95th Cong., 1st Sess. 220–27, *reprinted in* [1977] U.S.Code Cong. & Admin.News, pp. 1077, 1299–1306; H.Conf.Rep. No. 564, 95th Cong., 1st Sess. 126–27, *reprinted in* [1977] U.S.Code Cong. & Admin.News, pp. 1506–07; 42 U.S.C. § 7410(a)(5).

■ The significance of this provision here lies in the absence of any similar restriction on the scope of "transportation control measures" as it is used in § 304(f)(3), quoted *supra,* thus suggesting by negative implication that a measure which is part of an indirect source review program is included within the ambit of § 304. As a matter of statutory construction, the authorities appear uniform in holding that an explicit exclusion appearing in and specifically limited to one provision of a statute and not included in another provision of the same statute logically implies that the exclusion is inapplicable as to the latter provision. *City of Burbank v. General Electric Co.,* 329 F.2d 825, 832 (9th Cir. 1964); *Arley v. United Pacific Insurance Co.,* 379 F.2d 183, 188 (9th Cir. 1967), *cert. denied,* 390 U.S. 950, 88 S.Ct. 1039, 19 L.Ed.2d 1140 (1968); *Marshall v. B. W. Harrison Lumber Co.,* 569 F.2d 1303, 1307 (5th Cir. 1978). Thus, were indirect source review programs intended to be excluded also from "transportation control measures" as used in § 304(f), it seems to us that Congress would have said so, as it did in § 110(a).[9]

■ Second, a more significant indication of congressional intent can be drawn from the Report of the Committee on Conference on the 1977 Amendments. H.Conf.Rep. No. 564, 95th Cong., 1st Sess., *reprinted in* [1977] U.S.Code Cong. & Admin.News, p. 1502 *et seq.* Although the amendments to § 304 of the Act agreed upon by the Conference Committee and subsequently adopted without change by the Congress contain no explicit reference to indirect source review requirements,[10] the Committee's Report ac-

---

(i) exceeding any national primary ambient air quality standard for a mobile source-related air pollutant after the primary standard attainment date, or

(ii) preventing maintenance of any such standard after such date.

9. There are other indications in the legislative history of the 1977 Amendments that the term "transportation control measures" sometimes includes indirect source review requirements. For example, in the Report of the House Committee on Interstate and Foreign Commerce indirect source review regulations are cited as *one example of a transportation control strategy.* H.R.Rep. No. 294, 95th Cong., 1st Sess. 282, *reprinted in* [1977] U.S.Code Cong. & Admin.News, p. 1361. Another such example appears in § 202 of the House bill, where "transportation control measure" is defined to exclude all regulation of parking, which is one form of indirect source regulation. In its Report, the House Committee explained that "[t]he purpose of this exclusion is to assure that all regulation of parking is subject to the limitations of section 201" of the House bill, pertaining specifically to the regulation of indirect sources. *Id.* at 231, *reprinted in* [1977] U.S.Code Cong. & Admin.News, p. 1310. Just as in § 110 of the Act, discussed *supra,* this explicit exclusion would have been unnecessary if "transportation control measures" were in all cases understood as exclusive of indirect source requirements.

10. As adopted by the Conference Committee, § 303(b) of the 1977 Amendments provided in part as follows:

(b) Section 304(f) of [the Clean Air Act] is amended by . . . adding the following new paragraph at the end thereof:

"(3) any condition or requirement of a permit under part C of title I (relating to significant deterioration of air quality) or part D of title I (relating to nonattainment), any condition or requirement of section 113(d) (relating to certain enforcement orders), section 119 (relating to primary nonferrous smelter orders), requirements under an applicable implementation plan relating to transportation control measures, air quality maintenance plans, vehicle inspection and maintenance programs or vapor recovery requirements, section 211(e) and (f) (relating to fuels and fuel additives), or section 169A (relating to visibility protection), any condition or requirement under part B of title I (relating to ozone protection), any requirement under section 111 or 112 (without regard to whether such requirement is expressed as an emission standard or otherwise)."

\* \* \* \* \* \*

H.Conf.Rep. No. 95–564, 95th Cong., 1st Sess. 94–95 (1977).

The Amendments were approved by voice vote as part of the Conference Report on August 4, 1977. *See* 123 Cong.Rec. H8672, S13711 (daily ed. Aug. 4, 1977).

companying and explaining those particular amendments makes specific mention of such requirements in referring to transportation control measures. Under the heading "Conference Agreement," the Report states, in pertinent part:

The House concurs in the Senate amendment with the following amendments: citizens suits are authorized against sources to enforce compliance only with respect to (1) "emission standards or limitations", including schedules and timetables for compliance, not subject to citizen suits under the Act; . . and (3) the violation of any condition or requirement specified by the State or the Administrator under a significant deterioration or non-attainment permit or under a delayed compliance order, enforcement order, smelter order, or compliance date extension; . . . *transportation control plans or indirect source review requirements,* vehicle inspection and maintenance programs; . . . [and] air quality maintenance plan requirements . . . (Emphasis added.)

*Id.* at 173, *reprinted in* [1977] U.S.Code Cong. & Admin.News, pp. 1553–54. This explanatory language of the committee, read together with the more economical wording of the statute itself, constitutes strong evidence that the intended scope and meaning of "transportation control measures" encompasses any indirect source review requirements contained in an applicable state implementation plan. Thus construed, the amendment to § 304(f) in effect places in the same category as substantive emission requirements any indirect source review provisions adopted and approved as part of a state plan. Although ambiguous legislative history should not be allowed to control the ordinary meaning of statutory language, *National Labor Relations Board v. Plasterers' Local No. 79,* 404 U.S. 116, 129–30, 92 S.Ct. 360, 368, 30 L.Ed.2d 312 (1971), the expressed understanding of the Conference Committee, commended to the full Congress in the Conference Report and subsequently adopted, is not lightly to be disregarded, particularly where, as here, that understanding is supported by other evidence as well. *American Jewish Congress v. Kreps,* 187 U.S.App.D.C. 413, 416, 574 F.2d 624, 629 (1978); *International Tel. & Tel. Corp. v. General Tel. & Electronics Corp.,* 518 F.2d 913, 921 (9th Cir. 1975).

■ It is a well established principle of statutory construction that words of a statute be placed in their proper context by resort to legislative history where they are not conclusive as to congressional intent. *Tidewater Oil Co. v. United States,* 409 U.S. 151, 158, 93 S.Ct. 408, 413, 34 L.Ed.2d 375 (1972); *Walt Disney Productions v. United States,* 480 F.2d 66, 68 (9th Cir. 1973), *cert. denied,* 415 U.S. 934, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974); *Ralpho v. Bell,* 186 U.S. App.D.C. 397, 399, 569 F.2d 636, 638 (1977). The above history and analysis of the amendments provide sufficient illumination to enable us to find that the phrase "transportation control measures" in § 304(f)(3) of the Act includes indirect source review provisions such as the Nevada complex source regulations here involved.

■■ It further appears to us that, although the amendment relevant here was adopted during the pendency of this action, it is nonetheless applicable to this appeal. Section 406(d)(1) of the 1977 Amendments, 42 U.S.C. § 7401 note, provides that "[e]xcept as otherwise expressly provided, the amendments made by this Act [the 1977 Amendments] shall be effective on the date of enactment [August 7, 1977]." Such a provision is consistent with the decision of the United States Supreme Court in *Bradley v. School Board of City of Richmond,* 416 U.S. 696, 712, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974), rejecting the contention that a change in the law is to be given effect in a pending case only where that is the clear and stated intention of the legislature, and upholding the general principle that "a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is a statutory direction or legislative history to the contrary." *See also Hallowell v. Commons,* 239 U.S. 506, 36 S.Ct. 202, 60 L.Ed. 409 (1919); *Thorpe v. Housing Authority of City of Durham,* 393 U.S. 268,

281–83, 89 S.Ct. 518, 526–27, 21 L.Ed.2d 474 (1969); *United States v. Blue Sea Line,* 553 F.2d 445, 448–50 (5th Cir. 1977); *Beazer v. New York City Transit Authority,* 558 F.2d 97, 100 (2d Cir. 1977). In view of the express provision for immediate effectiveness in § 406 of the 1977 Amendments and because no manifest injustice would result, application of the amendments to this action is proper. Thus, the district court had jurisdiction under § 304 of the Act to consider the alleged violation of the Nevada complex source regulations.

### III

Having determined jurisdiction under § 304, we turn next to the question of whether the complaint, which alleges a violation of the same section, states a cause of action upon which relief may be granted. The district court dismissed the amended complaint as stating no cognizable claim because it "affirmatively shows compliance with the procedural and enforcement requirements of an approved state [implementation] plan." 427 F.Supp. at 1360. Appellants dispute this conclusion, arguing that when constructed the two hotel-casinos involved will violate the applicable ambient air quality standards for CO and, therefore, that the registration certificates issued are invalid. Because the Nevada air quality regulations, incorporated in the state implementation plan, authorize construction only of complex sources for which a valid certificate has been issued, appellants argue that the regulations have been violated in this case and, further, that such violation constitutes a violation of an emission limitation. In other words, they equate violation of the ambient air quality standard, which may result from the issuance of an allegedly invalid registration certificate, with violation of an emission limitation.

█ The effect of appellants' position is to blur the established distinction between an "emission standard or limitation" and the ambient air quality standards. To adopt their view would not only contravene the principle that such air quality standards are not emission limitations, *Plan For Arca-*

*dia, Inc. v. Anita Associates,* 501 F.2d 390, 392 (9th Cir.), *cert. denied,* 419 U.S. 1034, 95 S.Ct. 517, 42 L.Ed.2d 309 (1974); *Thompson v. Chicago,* 7 E.R.C. 1682 (N.D.Ill.1975); *New Mexico Citizens v. Train,* 6 E.R.C. 2061, 2064 (D.N.M.1974), but would also sanction federal jurisdiction based solely upon allegations of a prospective violation of the ambient air quality standards. Section 304(a) of the Act provides no basis for such a suit. Nor could such an interpretation be reconciled with the accepted definition of "emission standard or limitation," the purpose of which is to insure achievement and maintenance of the ambient air quality standards. *Train v. Natural Resources Defense Council,* 421 U.S. at 79, 95 S.Ct. at 1481. In discussing this phrase in light of the legislative history of the Act, the District of Columbia Court of Appeals stated in *Citizens Association of Georgetown v. Washington,* 175 U.S.App.D.C. at 360, 535 F.2d at 1322:

> The enumerated items [*i. e.* emission standards or limitations] were intended as "objective evidentiary standard[s] [which] would have to be met by the citizen who brings an action under the [citizen suit provision]." S.Rep. No. 91–1196, 91st Cong., 2d Sess. 36 (1970), *reprinted in* Legislative History, *supra,* at 436. The determination of whether a government instrumentality or other "person" is a polluter for purposes of section 304 was to be made against these objective standards, which were to be "settled in the administrative procedure leading to an implementation plan or emission control provision." *Id., reprinted in* Legislative History, *supra,* at 436. Congress expressly intended that an alleged violation not involve "reanalysis of technological or other considerations at the enforcement stage." *Id., reprinted in* Legislative History, *supra,* at 436.

As applied to the indirect source review procedure here involved, these objective standards certainly include the specific limitations on construction and facility size imposed as conditions upon approval of the application for a registration certificate. More to the point in this case, however,

such standards, as defined under the 1977 Amendments, would also include the procedural provisions of the Nevada state implementation plan cited *supra* requiring application for a certificate for any proposed new complex source, review of that application by designated state officials, and issuance of the certificate unless the "environmental evaluation submitted by the applicant shows, or the Director determines, that the source will prevent the attainment and maintenance" of the ambient air quality standards. As the district court correctly emphasized, there has been complete compliance with all these requirements of the Nevada plan, and appellants are simply attempting through this action to obtain federal court review of an administrative decision entrusted by Congress to state officials. *See* 42 U.S.C. § 7401(a)(3).[11] Unlike the situation in *Friends of the Earth v. Carey,* 552 F.2d 25 (2d Cir. 1977) and 535 F.2d 165 (2d Cir. 1976), cited repeatedly by appellants, where state officials were admittedly in violation of explicit strategies incorporated in the New York state implementation plan, appellees here have each fulfilled their respective obligations under the Nevada plan. For us now to hold that, after having done so, they are still subject to a valid claim for violation of an emission limitation based upon those same actions would be an anomalous result which we believe is mandated neither by the Act nor by the Nevada plan promulgated and approved pursuant to the Act.

■ Appellants' most specific allegation concerning the registration certificates challenges the failure of appellee Trounday in conducting his analysis of the applications involved to factor in the "most adverse meteorological conditions." They have cited no federal or state statutes or regulations, however, mandating consideration of such a factor as an essential precondition to issuance of a permit. Absent authority for appellants' contention, we believe that discretion should properly repose in the responsible state officials to establish such computer methods and analysis as they deem appropriate.

■ Thus, we conclude that appellants have failed to allege facts constituting a violation of a specific emission limitation and, therefore, that they have not stated a cause of action upon which relief may be granted under § 304(a) of the Act. Appellants' challenge to the administrative determinations made by Nevada officials pursuant to relevant provisions of the Nevada plan should have been pursued through the administrative review procedures set forth as part of the plan.[12] *See American Federation of Government Employees, Local 1168 v. Dunn,* 561 F.2d 1310, 1314–15 (9th Cir. 1977); *Shell Oil Company v. Train,* 585 F.2d 408, 414 (9th Cir. 1978); *California Tahoe Regional Planning Agency v. Jennings et al.,* 594 F.2d 181, 190–92 (9th Cir. 1979). Their failure to pursue that avenue of review within the applicable time limitations does not now entitle them to a remedy in a federal forum. *Id.*[13]

---

11. In its findings in Subchapter I of the Act, Congress explicitly stated that "the prevention and control of air pollution at its source is the primary responsibility of States and local governments." 42 U.S.C. § 7401(a)(3).

12. The Nevada state implementation plan provided for an appeal of any action of the Department of Human Resources to the Nevada State Environmental Commission. Nev.Rev.Stat. § 445.501; Nev. Air Quality Reg. § 2.10; Nev. Env.Com.Admin. Rule 8. Nev.Rev.Stat. § 445.-498 requires the party aggrieved to file a notice of appeal with the Commission within 10 days after the date of notice of the action of the Department. Rule 8 of the Administrative Rules also imposes the same 10-day limitation on the time for filing an appeal. Both the Nevada Revised Statutes and the Administra-

tive Rules require that upon appeal the Commission shall hold a public hearing and make a complete record and findings. Nev.Rev.Stat. § 445.499; Nev.Env.Com.Admin. Rules 9–15. Because appellant League intervened in the application proceeding, it cannot claim lack of notice of the actions in question. Nor, in view of its allegations in the amended complaint pertaining to standing, do we believe that it can seriously argue that it was not sufficiently aggrieved to appeal the administrative action.

13. This does not mean, however, that appellants are entirely without a remedy. One condition of the registration certificates issued to appellees Jennings and Kahle bears upon the possibility that the casinos, when constructed, may cause a violation of the ambient air quality standards. As described in a letter dated June

Accordingly, the decision of the district court dismissing the complaint in this action is hereby AFFIRMED.

11, 1975 from appellee Trounday to James Bruner, Jr., Executive Director of the League, that condition is as follows:

> If within one year after construction, after an on-site inspection, the Director determines that the facility may cause a violation of the ambient air quality standards, the developer is responsible for monitoring and the necessary modification. One year after the construction completion, the Director is responsible for the issuance of any necessary notices of violation and, after their issuance, the Environmental Commission, during an administrative hearing, may levy an administrative fine of up to $5,000 per day of violation.