**OGDEN PROJECTS, INC., Ogden Martin Systems of Lancaster, Inc., John Snyder, and Jeffrey R. Horowitz, Plaintiffs,**

**v.**

**NEW MORGAN LANDFILL COMPANY, INC., Defendant.**

**Civ. A. No. 94–3048.**

United States District Court, E.D. Pennsylvania.

Jan. 8, 1996.

Clean Air Act. In addition, for purposes of clarity, we reiterate all parts of our prior decision that remain unchanged thus creating one new comprehensive opinion.

Scott M. Turner, Michael S. Cohen, Rochester, NY, and Wilbur L. Kipnes, Philadelphia, PA, for plaintiffs.

Henry V. Nickel, Jeffrey N. Martin, William F. Pedersen, Washington, DC, and Peter F. Marvin, Philadelphia, PA, for defendant.

## *DECISION AND ORDER*

VAN ANTWERPEN, District Judge.

On September 21, 1995, this Court ruled that Defendant, New Morgan Landfill Company, Inc., constructed a solid waste landfill in violation of the Clean Air Act. *Ogden Projects, Inc. v. New Morgan Landfill Company, Inc.*, 1995 WL 564215 (E.D.Pa.). Much of the ruling was based on the Environmental Protection Agency's ("EPA's") regulation defining the term "potential to emit." Unbeknownst to us,[1] on September 15, 1995, six days before we ruled, the District of Columbia Circuit Court of Appeals vacated this regulation.

On October 5, 1995, Defendant submitted a Motion for Reconsideration requesting recision of our September 21, 1995, ruling in light of the D.C. Circuit's decision. After assessing this decision's impact, we now find Defendant not in violation of the Clean Air Act. Accordingly, we rescind all parts of our September 21, 1995, Decision and Order dealing with Defendant's violation of the Clean Air Act. In addition, for purposes of clarity, we reiterate all parts of our prior decision that remain unchanged thus creating one new comprehensive opinion.

## I. BACKGROUND

Plaintiffs instituted this action on May 18, 1994, alleging that Defendant, New Morgan Landfill Company, Inc., constructed and continues to operate a solid waste landfill in Berks County, Pennsylvania, without the requisite Clean Air Act permit. Plaintiffs are proceeding under the citizen suit provision of the Clean Air Act, 42 U.S.C. § 7604(a)(3) (1988 & Supp. II 1990), and this Court has jurisdiction over the subject matter pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 7604(a).

On April 20, 1995, this Court denied both parties cross-motions for summary judgment without prejudice to the right of the parties to develop a stipulated statement of facts which could be submitted to the Court for a non-jury determination. On June 16, 1995, the parties filed with the Court a Joint Pretrial Stipulation and agreed that the Court should make a non-jury determination of this matter.[2] The Joint Pretrial Stipulation sets forth "Matters Which the Parties Agree are Facts for Purposes of the Determination of this Action," as well as "Uncontroverted Assertions of Fact," on numerous subjects pertinent to this case.[3]

## II. STATEMENT OF FACTS

Given that the June 16, 1995, Joint Pretrial Stipulation sets forth the facts at length, a brief summation will suffice for present purposes.

1. All papers submitted to this Court in conjunction with that decision made arguments based on the then valid EPA definition of "potential to emit."

2. The parties contemplated resolution of outstanding issues pertaining to standing and a trial and decision on the merits if the Court found plaintiffs had standing. In that respect Plaintiffs seek a final permanent injunction.

3. The Defendant has objected to several factual matters contained in the Stipulation. *See* Stip. at ¶¶ 39, 102. To the extent that Defendant objects to relevance, the objection is overruled. To the extent that the Defendant disputes accuracy, we note that Defendant has presented no factual evidence to support Defendant's objections and such bare allegations are not admissible at trial and would not even be sufficient to oppose a motion for summary judgment. *First Nat'l Bank of Pennsylvania v. Lincoln Nat'l Life Ins. Co.*, 824 F.2d 277, 282 (3d Cir.1987). Local Civil Rule 16.1(d)2.(b)(2) and our October 18, 1994, pretrial order both required that this case be ready when called for trial. To the extent that Defendant objects to admissability, this is inconsistent with the Court's order of April 20, 1995, the parties' acquiescence in that order, and subsequent express stipulation that the Court shall resolve this matter on the stipulated facts presented.

Defendant, New Morgan Landfill Company, Inc., is a Pennsylvania corporation that owns and operates the Morgantown Landfill, a municipal solid waste landfill located in Berks County, Pennsylvania. Stip. at ¶¶ 4, 5. In November, 1987, Defendant filed an application with the Pennsylvania Department of Environmental Resources ("PADER") for a permit to construct and operate the Morgantown Landfill and on June 24, 1992, PADER's Bureau of Waste Management issued to Defendant the requested solid waste permit. *Id.* at ¶¶ 47, 62.

This permit did not require Defendant to obtain a Clean Air Act Part D permit as a condition to the authorization to construct the landfill. *Id.* at ¶ 65. The permit did, however, require Defendant to install and operate a gas management system. *Id.* at ¶ 64. In addition, it required that Defendant obtain approval for the gas management system from PADER's air quality program prior to commencing construction of the system. *Id.* at ¶ 66. On February 15, 1995, Defendant submitted an Air Quality Permit Application to PADER for the gas management system. *Id.* at ¶ 71. On August 9, 1995, Defendant resubmitted a revised air quality permit application to PADER. *See* Defendant's Trial Brief, Exhibit A. This permit application is presently pending before PADER.

Defendant commenced construction of the landfill in November, 1992, and began accepting waste for disposal on January 6, 1994. Stip. at ¶ 69.

On May 18, 1994, Plaintiffs instituted the present action asserting that Defendant constructed the Morgantown Landfill without obtaining the requisite Clean Air Act permits. Plaintiff Ogden Projects Inc. ("OPI") is a Delaware corporation which through its wholly owned subsidiaries constructs, owns and operates "resource recovery facilities." *Id.* at ¶ 11, 12. Commonly referred to as garbage incinerators, these facilities dispose of municipal solid waste through combustion. *Id.* at ¶ 13. Plaintiff Ogden Martin Systems of Lancaster Inc. ("OMSL"), a wholly owned subsidiary of OPI, operates a resource recovery facility in Lancaster County, PA, approximately 35 miles from the Morgantown Landfill. *Id.* at ¶¶ 15, 16, 19.

Plaintiff Jeffrey R. Horowitz is a Senior Vice–President and General Counsel for each of the corporate Plaintiffs. *Id.* at ¶ 9. Plaintiff John Snyder is an engineer employed by Ogden Resource Recovery Plant Services, Inc., a firm under contract with OMSL to perform the day to day operations of the OMSL facility. *Id.* at ¶¶ 6, 20.

Plaintiffs ask this Court to issue a declaratory judgment that Defendant has violated and continues to violate Part D of Title I of the Clean Air Act, enjoin further operation of the Landfill until Defendant obtains the proper Clean Air Act permit, order Defendant to pay civil penalties, and award costs to Plaintiffs.

## III. Justiciability Discussion

Before reaching the substantive dispute, we must first decide (1) whether this Court's jurisdiction may be invoked to collaterally attack PADER's failure to require a Part D permit, and (2) whether Plaintiffs have standing to maintain this action.

### *A. Subject Matter Jurisdiction*

This Court is the proper forum to resolve Plaintiffs' claim that Defendant violated the Clean Air Act (CAA) by not obtaining a Part D permit. Defendant contends that because in 1992 PADER issued the solid waste permit without requiring a CAA Part D permit, Plaintiffs may only challenge PADER's decision in Pennsylvania state courts, not through a collateral attack in federal court. Defendant's Trial Brief at 41–42.

Defendant's argument fails under the plain meaning of the CAA's citizen suit provision. This provision, section 304 of the CAA, states:

> [A]ny person may commence a civil action on his own behalf ... against any person who proposes to construct or constructs any new or modified major emitting facility without a permit required under ... Part

D of subchapter I of this chapter (relating to nonattainment).

42 U.S.C. § 7604(a)(3).

This provision thus expressly authorizes citizen suits against persons who propose to construct or who do construct major facilities without the proper Part D permit. Since Plaintiffs contend that Defendant constructed the Morgantown Landfill without the required Part D permit, their case falls squarely within the statute and this Court has jurisdiction. *See American Lung Ass'n of N.J. v. Kean,* 670 F.Supp. 1285, 1290 (D.N.J.), *aff'd* 871 F.2d 319, 323–25 (3d. Cir. 1989); *League to Save Lake Tahoe, Inc. v. Trounday,* 598 F.2d 1164, 1173 (9th Cir.), *cert. denied,* 444 U.S. 943, 100 S.Ct. 299, 62 L.Ed.2d 310 (1979). Furthermore, "where the language of the statute is clear, only 'the most extraordinary showing of contrary intentions' justif[ies] altering the plain meaning of a statute." *Malloy v. Eichler,* 860 F.2d 1179, 1183 (3d. Cir.1988) (quoting *Garcia v. United States,* 469 U.S. 70, 75, 105 S.Ct. 479, 482–83, 83 L.Ed.2d 472 (1984)).

Defendant cites *Trounday* in arguing that PADER's issuance of a solid waste permit without requiring a Part D permit precludes Plaintiffs from pursuing a CAA citizen suit claim in federal court. Defendant's Trial Brief at 45–46. In *Trounday,* plaintiffs filed a citizen suit under § 304 of the CAA in federal court seeking to enjoin the construction of two hotels. Plaintiffs claimed that Nevada issued preconstruction permits in violation of the provisions in its SIP relating to the attainment and maintenance of ambient air quality standards. *Trounday,* 598 F.2d at 1173. Plaintiffs asserted that the hotel emissions would violate these air quality standards.[4] *Id.* The Ninth Circuit held that while it had jurisdiction over the case, *id.,* the plaintiffs failed to state a claim for which relief could be granted under CAA § 304(a)(1). *Id.* at 1174. Given that the Nevada officials complied with all the requirements of the Nevada SIP, the court found that "appellants' challenge to the [permit] ... should have been pursued through the administrative review procedures set forth as part of the [Nevada SIP]." *Id.*

Based on this, Defendant asserts that state courts are also the exclusive forums to enforce a permit requirement where no permit has been issued. Defendant's Trial Brief at 44–45. We do not agree. The statute expressly provides for federal court citizen suits against persons who construct major facilities "without a permit required under ... Part D." 42 U.S.C. § 7604(a)(3).

In addition, a material distinction warrants treating challenges based on the terms and conditions of an actual permit differently than challenges based on the failure to require a permit at all. Setting the terms and conditions of CAA permits is a discretionary function that Congress delegated to the EPA and individual state agencies in acknowledgement of their special expertise and competence. *Cf. Trounday,* 598 F.2d at 1174 (determining whether proposed source will prevent maintenance of ambient air quality standards is "[a]n administrative decision entrusted by Congress to state officials."). As such, it is appropriate to defer to state law procedures for judicial review of state agency action as well.

Whether or not to issue a permit at all, however, is a non-discretionary act. Deference to administrative expertise is not involved as Congress left no room for discretion. The substantive element of the present dispute involves determining whether Defendant's Landfill will emit a quantity of VOCs great enough to require a CAA Part D permit. Given the parties' stipulation of the pertinent facts, we feel competent to address this issue.

Defendant further maintains that PADER's determination that a Part D permit was not required renders the Pennsylvania state court system the only place for Plaintiffs to redress their grievances. Defendant's Trial Brief at 47–52. This also is incorrect. Defendant has no basis for reading such a quali-

4. Although hotels may not themselves emit regulated air contaminants, they are considered indirect sources of air pollution in Nevada because they attract or involve automobile traffic which may emit air contaminants for which there are applicable ambient air quality standards. *Id.* at 1167.

fication into the statute. Section 304 does not contain any language conditioning the availability of a federal court citizen suit on the nonexistence of a state agency applicability determination.

Our reading of section 304 is consonant with judicial interpretation of the Clean Water Act's similar citizen suit provision.[5] In *Committee to Save the Mokelumne River v. East Bay Municipal Utility District,* 37 ERC 1159, 1993 U.S.Dist. LEXIS 8364 (E.D.Cal. March 3, 1993), *aff'd* 13 F.3d 305 (9th Cir.1993), plaintiffs brought suit after the state determined that a Clean Water Act permit was not required for defendant's effluent discharge. The District Court held that while a substantive challenge to the conditions of the permit would lie in state court, challenges based on the state's failure to require a permit at all are proper in federal court. *Id.* at *18. Similarly, in the case at bar, Plaintiffs' challenges, grounded in PADER's failure to require a Part D permit, are proper in federal court.

*B. Standing*

The Corporate Plaintiffs, but not the Individual Plaintiffs, have established standing to maintain this action in federal court.

Article III of the Constitution limits the jurisdiction of federal courts to an actual "case or controversy." *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). An "essential and unchanging" component of this jurisdictional prerequisite is that the plaintiff have standing to sue. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). The primary focus of the standing issue is "on the party seeking to get his complaint before a federal court." *Flast v. Cohen,* 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968). The Supreme Court has laid out the constitutional requirements for standing:

> Over the years, our cases have established that the irreducible minimum of standing contains three elements: First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally-protected interest which is (a) concrete and particularized, *see id.* [*Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) ] [468 U.S.] at 756 [104 S.Ct. at 3327]; *Warth v. Seldin,* 422 U.S. 490, 508 [95 S.Ct. 2197, 2210, 45 L.Ed.2d 343] (1975); *Sierra Club v. Morton,* 405 U.S. 727, 740–41 n. 16 [92 S.Ct. 1361, 1368 n. 16, 31 L.Ed.2d 636] (1972); and (b) "actual or imminent, not 'conjectural' or 'hypothetical,'" *Whitmore, supra* [*v. Arkansas,* 495 U.S. 149, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) ] at 155 [110 S.Ct. at 1722–23] (quoting *Los Angeles v. Lyons,* 461 U.S. 95, 102 [103 S.Ct. 1660, 1665, 75 L.Ed.2d 675] (1983)). Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 41–42 [96 S.Ct. 1917, 1926, 48 L.Ed.2d 450] (1976). Third, it must be "likely," as opposed to merely "speculative" that the injury will be "redressed by a favorable decision." *Id.* at 38, 43 [96 S.Ct. at 1924, 1926–27.]

*Lujan,* 504 U.S. at 560–61, 112 S.Ct. at 2136. In short, the three constitutional requirements are injury, causation and redressability.

The burden of proving these three elements falls on the party invoking federal jurisdiction. *Id.* at 561, 112 S.Ct. at 2136–37 (*citing FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 607–08, 107 L.Ed.2d 603 (1990); *Warth,* 422 U.S. at 508, 95 S.Ct. at 2210). Establishing standing is more than just a mere pleading requirement but rather "an indispensable part of the plaintiff's case." *Lujan,* 504 U.S. at 561, 112 S.Ct. at 2136. Each element must be supported "with the manner and degree of evidence required at the successive stages of litigation." *Id.* (*citing Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 114–115, n. 31, 99 S.Ct.

5. Clean Water Act, 33 U.S.C. § 1365(a) ("[a]ny citizen may commence a civil action on his own behalf ... against any person ... alleged to be in violation of ... an effluent standard or limitation under this chapter ...").

1601, 1616 n. 31, 60 L.Ed.2d 66 (1979); *Simon,* 426 U.S. at 45, n. 25, 96 S.Ct. at 1927, n. 25; *Warth,* 422 U.S. at 527, and n. 6, 95 S.Ct. at 2219, and n. 6 (Brennan, J., dissenting)). At the trial stage the plaintiff must set forth specific facts " 'supported adequately by the evidence adduced at trial.' " *Lujan,* 504 U.S. at 561, 112 S.Ct. at 2137, (quoting *Gladstone, Realtors,* 441 U.S. at 115, 99 S.Ct. at 1615–16).[6]

The doctrine of standing is a blend of the above three constitutional requirements plus three related prudential considerations. These latter principles are: (1) that the plaintiff does not rest the claim on third parties' rights or interests; (2) the plaintiff's injury does not amount to a generalized grievance; and (3) that the plaintiff suffers injury to an interest within the zone protected or regulated by the statute or constitutional guarantee. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 474–75, 102 S.Ct. 752, 759–60, 70 L.Ed.2d 700 (1982).

1. Individual Plaintiffs

To satisfy the first constitutional element of standing, injury in fact, a plaintiff must prove his injury to be " 'concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical.' ' " *Lujan,* 504 U.S. at 560, 112 S.Ct. at 2136 (*citations omitted*). We believe the Individual Plaintiffs here have not made such a showing.

The Individual Plaintiffs base their alleged injuries on the following facts. Plaintiff John Snyder resides approximately 25 miles from the Morgantown Landfill and utilizes the recreational resources of Lancaster and Berks counties with his young children. Stip. at ¶¶ 7, 21–28. In addition, Plaintiff's expert stated that the air quality in Berks County would have been better if Defendant complied with CAA Part D permitting requirements. *Id.* at ¶ 101(e). This is so because the CAA requires a new major facility in a nonattainment area to obtain an offsetting emission reduction as a condition precedent to obtaining a construction permit. 42 U.S.C. § 7503(a)(1)(A); *see also* 40 C.F.R. §§ 51.165(a)(3)(ii)(F). As a consequence, Plaintiff Snyder asserts that emissions from the Morgantown Landfill will diminish surrounding air quality and thereby adversely affect his health, environmental and recreational interests. Plaintiff's Trial Brief at 43.

Plaintiff Jeffrey Horowitz resides approximately 85 miles from the landfill. Stip. at ¶ 10. Nonetheless, his residence still falls within the Northeast Ozone Transport Region, the same nonattainment region that the Morgantown Landfill falls within. *Id.* at ¶¶ 29–30. He bicycles, skis and regularly uses the outdoor recreational resources of northern New Jersey with the rest of his family. *Id.* Plaintiff Horowitz claims that given this he suffers anxiety over the impact of Morgantown Landfill emissions on his health. Plaintiff's Trial Brief at 46. Plaintiff's expert stated that such concerns are reasonable. Elias Aff. at ¶ 18. He is also concerned with the ecological health of the Great Swamp National Wildlife Refuge, a place where he regularly bicycles. Stip. at ¶¶ 29–30. Plaintiff's expert testified that elevated levels of ozone negatively impact such ecosystems and degrade the aesthetic appeal of the sky. Elias Aff. at ¶ 20. The expert did not state the amount of ozone necessary to create such effects.

The Supreme Court has long recognized that injury to a plaintiff's health, environmental, recreational or aesthetic interests constitutes the type of injury sufficient to confer standing. *Morton,* 405 U.S. at 734, 92 S.Ct. at 1365–66. Nonetheless, we believe the Individual Plaintiffs fall short of establishing that their alleged injuries are sufficiently concrete to satisfy the first prong of the standing test. The Individual Plaintiffs offer no evidence regarding the magnitude of the diminished air quality nor the specific direct effect, if any, that this diminished air quality will have on their health, environmental and recreational interests. From the fact that the air quality in the geographical area surrounding the landfill would have been better had Defendant obtained a Part D permit,

6. In *Gladstone, Realtors* the Supreme Court recognized that in some instances the standing issue is not resolved until the trial stage of litigation. 441 U.S. at 115, n. 31, 99 S.Ct. at 1616, n. 31.

Individual Plaintiffs summarily conclude that their health, environmental and recreational interests suffer injury, without filling in the blanks. Plaintiff's Trial Brief at 43–47.

The Individual Plaintiffs cite cases upholding standing that involved more specific injuries to the complaining party's health, environmental and recreational interests than those alleged by Plaintiffs here. In *Public Int. Research of N.J. v. Powell Duffryn,* 913 F.2d 64 (3rd. Cir.1990), *cert. denied* 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991), plaintiffs sued defendant for discharging effluent into the Kill Van Kull waterway in violation of its Clean Water Act discharge permit. The court found injury in fact to the plaintiff's aesthetic and recreational interests. *Id.* at 71. One plaintiff submitted an affidavit stating that he was offended by the brown color and bad odor of the water and that he would birdwatch and enjoy his recreation more frequently on the Kill Van Kull if the water was cleaner. *Id.* Other plaintiffs/affiants stated they would boat, fish or swim on the Kill Van Kull if the water was cleaner. *Id.* The court, noting that the defendant did not introduce any evidence challenging the legitimacy of plaintiff's injuries, found sufficient interference with the plaintiff's enjoyment of the Kill Van Kull to satisfy the injury in fact requirement of the standing test. *Id.*

Deciding whether to grant the individual Plaintiffs standing in the instant case was a close call. Nevertheless we believe the Plaintiffs have not set forth facts establishing their injuries with the degree of specificity required by the Third Circuit in *Powell Duffryn.* The plaintiffs in *Powell Duffryn* showed that defendant's effluent discharges impaired the Kill Van Kull waterway and explained how this impairment negatively impacted their use and enjoyment of the resource. The individual Plaintiffs in the case at bar have made no such showing. They have not offered evidence establishing how much ozone will be produced by emissions of VOCs from the landfill.[7] In addition, they never established that increased ozone levels would be severe enough to affect their health, recreational or environmental interest. In fact, unlike the plaintiffs in *Powell Duffryn,* Plaintiff Horowitz has not even asserted that he has or will curtail his outdoor activities due to the Morgantown Landfill's emissions. Stip. at ¶ 30. Instead, the Individual Plaintiffs cursorily rely on general EPA recognition that landfill emissions present human health hazards. Plaintiff's Trial Brief at 40.

In short, the individual Plaintiffs are too hasty in drawing a causal connection between VOC emissions from the Morgantown Landfill and the potential injury to their health, environmental and recreational interests. The individual Plaintiffs therefore have not satisfied their burden of proving injury in fact and thus do not have standing to bring this action. If they did have standing on the facts before us, standing would become automatic for anyone living in the Northeast Ozone Transport Region.

Given Plaintiff's failure to establish injury in fact, it is not necessary to determine whether the individual Plaintiffs satisfied the other two constitutional requirements for standing.

2. Corporate Plaintiffs

We believe the Corporate Plaintiffs have standing to maintain the present action. Their injury is economic in nature.

Plaintiff OMSL, a wholly owned subsidiary of Plaintiff OPI, operates a solid waste incinerator in Lancaster County, PA, approximately 35 miles from the Morgantown Landfill. Stip. at ¶¶ 15, 16, 19. OMSL obtained a CAA permit from PADER prior to constructing its incinerator in 1989. Horowitz Aff. at ¶ 17. Defendant never obtained a CAA Part D permit for the Morgantown Landfill. Stip. at ¶ 45. Corporate Plaintiffs therefore incurred the costs of complying with the CAA while Defendant did not. *See* Plaintiff's Trial Brief at 50. Corporate Plaintiffs claim that this cost differential translates into their own

7. According to the EPA, landfills contribute to the formation of ozone through the following process. The anaerobic decomposition of buried waste in landfills produces landfill gas. Stip. at ¶ 34. Landfill gas contains trace amounts of NMOCs, which consist primarily of VOCs. *Id.* at ¶ 36. VOCs in turn contribute to the formation of ozone. *Id.* at ¶ 38(i).

economic injury because they are competitively disadvantaged as compared to Defendant, an alleged competitor in the solid waste disposal market. *Id.* at 49–50.

Economic harms are recognized as injuries sufficient to confer standing. *Morton,* 405 U.S. at 733, 92 S.Ct. at 1365 ("palpable economic injuries have long been recognized as sufficient to lay the basis for standing ..."). The Corporate Plaintiffs have proven economic harm sufficient to establish injury in fact. The OMSL incinerator and the Morgantown Landfill, located just 35 miles from each other, are both solid waste disposal facilities. Stip. at ¶ 19. We do not doubt that to some extent the two facilities compete against each other.[8] Thus, if Defendant illegally escaped regulatory compliance costs in not obtaining the necessary CAA permit, while Plaintiffs incurred such costs, we agree that Plaintiffs suffer competitive disadvantage sufficient to constitute injury in fact. Two competitors are not operating on a level playing field if one acts in accordance with all applicable environmental laws while the other does not.

*Association of Data Processing Service Org., Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), involved a claim of competitive injury similar to the one involved here. In *Camp,* plaintiffs challenged a ruling of the Comptroller of the Currency allowing banks for the first time to make data processing services available to other banks and to bank customers. *Id.* at 151, 90 S.Ct. at 829. The Supreme Court upheld standing based on plaintiff's allegations that this new competition:

> might entail some future loss of profits for the petitioners, [and] that respondent [bank] was performing or preparing to perform such services for two customers for whom petitioner Data Systems, Inc., had previously agreed or negotiated to perform such services.

*Id.* at 152, 90 S.Ct. at 829.

Corporate Plaintiff's here offer specific evidence of similar economic injury. Jeffrey Horowitz, an employee of the Corporate Plaintiffs as well as an Individual Plaintiff in this action, submitted an affidavit stating:

> certain of defendant's identified sources of residual waste are or were customers of residual waste for OMSL. In addition, certain of those customers and sources identified in the fee reports [Ex. N] have been pursued in the past by OMSL as potential customers.

Horowitz Aff. at ¶ 22, Plaintiff's Trial Brief at 56. The Corporate Plaintiffs and the Defendant are therefore in a competitive relationship with each other similar to the one the Supreme Court found sufficient to support standing in *Camp.*

Defendant cites *Public Citizen v. Lockheed Aircraft Corp.,* 565 F.2d 708 (D.C.Cir.1977) in arguing Plaintiffs do not suffer economic injury. Defendant's Trial Brief at 68–70.[9] In *Lockheed,* firms involved in buying and selling used industrial machinery challenged the sale of government equipment to Lockheed Corporation. They alleged that the sale resulted in increased competition. 565 F.2d at 719. The Court denied standing finding no evidence that "Lockheed regularly competes with ... [plaintiffs] in the machinery resale market" or that Lockheed sold the equipment obtained in the challenged sale to "the same class of buyers to whom ... [plaintiffs] would attempt to sell." *Id.* at 719–720.

The present case is distinguishable on the facts. The two parties here are competitors in the solid waste disposal business. In addition, the Horowitz Affidavit indicates that the Plaintiffs and the Defendant share a similar customer base.

8. We find sufficient indicia of competition without relying on the stipulated facts at ¶ 97 which only establishes that in responding to Plaintiff's interrogatory, Defendant stated that it "objects to this interrogatory insofar as it seeks the disclosure of confidential customer information to a competitor."

9. Note that in *Lockheed* the court addressed whether plaintiffs established standing under the Administrative Procedure Act, not under the Constitution. 565 F.2d at 714.

Determining whether the Corporate Plaintiffs suffered injury in fact was also a close call. Nevertheless, we find sufficient economic injury to Plaintiffs stemming from Defendant's failure to obtain a Part D permit to constitute injury in fact.

The second constitutional element of standing requires that a plaintiff's injury be "fairly ... trace[able] to the challenged action of the defendant ..." *Lujan,* 504 U.S. at 560–561, 112 S.Ct. at 2136 (quoting *Simon,* 426 U.S. at 41–42, 96 S.Ct. at 1925–26). This element is easily satisfied here as Plaintiff's competitive injury stems directly from Defendant's alleged unlawful violation of the CAA. If Defendant had acquired the allegedly required CAA permit, Plaintiffs would not suffer any competitive disadvantage attributable to Defendant.

The third constitutional element of standing requires a plaintiff to demonstrate that his injury is "likely" to be "redressed by a favorable decision." *Id.* If the Plaintiffs prevail on the merits here and this Court orders compliance with the CAA, Plaintiffs and Defendant will be competing on a level playing field thereby eliminating any competitive disadvantage. As such, the Corporate Plaintiffs have satisfied this prong of the standing test.

We therefore find the Corporate Plaintiffs have standing to bring the present action in federal court.

## IV. THE CMA DECISION

In *Chemical Manufacturers Association v. EPA* ("*CMA*"), 1995 WL 650098 (D.C.Cir. September 15, 1995), 70 F.3d 637, petitioners challenged EPA regulations defining the term "potential to emit" that exclude emission controls and limitations that are not "federally enforceable." 54 Fed.Reg. 27,274; 54 Fed.Reg. 27,286 (June 28, 1989). *See* Brief of Petitioner Chemical Manufacturers Association, No. 89–1514, March 24, 1995 at 1. These EPA regulations are codified at 40 C.F.R. § 51.166(b)(4) and 40 C.F.R. § 51.165(a)(1)(iii).[10] The D.C. Circuit issued a Judgement stating that "the regulations are vacated and the case is remanded to the Environmental Protection Agency for reconsideration in light of *National Mining Association* [*v. EPA,* 59 F.3d 1351 (D.C.Cir. 1995) ]." 1995 WL 650098 at *2. On November 15, 1995, the D.C. Circuit issued its mandate for this case pursuant to Rule 41 of the Federal Rules of Appellate Procedure. This vacatur renders the regulation void. *See Alabama Power Co. v. EPA,* 40 F.3d 450, 456 (D.C.Cir.1994) (stating that to "vacate" means "to annul; to cancel or rescind; to declare, to make, or to render void; to defeat; to deprive of force; to make of no authority or validity; to set aside") (citations omitted); *see also Independent U.S. Tanker Owners Committee v. Dole,* 809 F.2d 847, 855 (D.C.Cir.1987) (noting that vacating a regulation returns the conditions to the *status quo ante* ), *cert. denied,* 484 U.S. 819, 108 S.Ct. 76, 98 L.Ed.2d 39 (1987).

Because we relied heavily on 40 C.F.R. § 51.165(a)(1)(iii) in deciding the instant case on September 21, 1995, we must assess the impact of the D.C. Circuit's vacatur.

## V. PROCEDURAL CHALLENGES REGARDING THE MOTION FOR RECONSIDERATION

### A. *Timeliness of Motion*

Defendant timely filed its motion for reconsideration. Plaintiffs incorrectly computed the filing deadline in arguing that Defendant's motion was untimely. *See* Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Reconsideration ("Opposition") at 5. Rule 59(e) of the Federal Rules of Civil Procedure and Rule 7.1(g) of this

10. For Part D permitting purposes, the EPA had defined "potential to emit" as follows:

> "Potential to emit" means the maximum capacity of a stationary source to emit a pollutant under its physical and operational design. Any physical or operational limitation on the capacity of the source to emit a pollutant, including air pollution control equipment and restrictions on hours of operation or on the type or amount of material combusted, stored or processed, shall be treated as part of its design only if the limitation or the effect it would have on emissions is **federally enforceable.** Secondary emissions do not count in determining the potential to emit of a stationary source.

40 C.F.R. § 51.165(a)(1)(iii) (1994) (emphasis added).

district's Local Rules require that parties file motions for reconsideration within 10 days after entry of a judgement.[11] Pursuant to Rule 6(a) of the Federal Rules, when the period of time for filing is less than 11 days, Saturdays, Sundays and legal holidays shall not be included in computing the due date.[12] *See Bergman v. Atlantic City,* 860 F.2d 560, 563, n. 2 (3d Cir.1988) (intervening holiday and weekend days not included in calculating the deadline for filing under Rule 59(e)). We issued our decision on September 22, 1995, and New Morgan filed its motion on October 5, 1995. The ten day period for filing a motion for reconsideration of this Court's September 22, 1995 decision thus expired on October 6, 1995. Defendant's October 5, 1995, filing met this deadline.

*B. Ripeness*

Plaintiffs argue that reconsideration of our decision is premature. Opposition at 5. In the *CMA* decision, the court vacated the offending regulations and remanded them to the EPA for reconsideration. Plaintiffs request that pursuant to the doctrine of primary jurisdiction, we stay the instant proceedings and wait for EPA to reformulate the offending regulation before making a decision on the merits. *Id.* at 7.

We decline Plaintiffs' request. Our September 21, 1995, decision found Defendant in violation of the CAA because an EPA regulation did not permit us to take into account Defendant's non-federally enforceable air pollution control equipment. This regulation is now void.[13] We cannot be sure when, if ever, EPA will repromulgate the offending regulation. We therefore find it inappropriate to leave Defendant in limbo with a federal judgement looming over its head while we wait for possible EPA action.

*C. The PA SIP's Federal Enforceability Requirement*

Up until now, Plaintiffs have been proceeding exclusively under § 304(a)(3) alleging that Defendants failed to obtain the permits required under Part D of the CAA.[14] Nonetheless, Plaintiffs argue that not withstanding the *CMA* decision, they may now proceed under § 304(a)(3) to enforce the federal enforceability requirement contained in the Pennsylvania SIP. Opposition at 8–12. PADER defines "potential to emit" as follows:

> Potential to emit—The maximum capacity of a source to emit a pollutant under its physical and operational design. Any physical or operational limitation on the capacity of the source to emit a pollutant, including air pollution control equipment and limitations on hours of operation or on the type or amount of material combusted, stored or processed shall be treated as part of the design if the limitation or the effect it would have on emissions is **federally enforceable.**

25 PA.ADMIN.CODE § 121.1 (1994) (emphasis added). This definition has been incorporated into the Pennsylvania SIP. 40 C.F.R. § 52.2020(c)(20) (1995).

Plaintiffs maintain that this definition remains valid as a matter of federal law despite the *CMA* decision. While this may be true,[15]

11. "A motion to alter or amend the judgement shall be served not later than 10 days after entry of a judgement." Fed.R.Civ.P. 59(e).

"Motions for reconsideration or reargument shall be served and filed within ten (10) days after the entry of the judgement, order, or decree concerned." Local Rules of the United States District Court for the Eastern District of Pennsylvania 7.1(g).

12. "In computing any period of time prescribed or allowed by these rules, by the local rules of any district court, or by any applicable statute, the day of the act, event, or default from which the designated period of time begins to run shall not be included.... When the period of time is less than eleven days, intermediate Saturdays, Sundays, and legal holidays shall not be included in the computation ..." Fed.R.Civ.P. 6(a).

13. *See supra* at 872.

14. Plaintiffs invoked this Court's jurisdiction under section 304(a) of the CAA. 42 U.S.C. § 7604(a) (1988 & Supp. II 1990). Plaintiffs' complaint makes no allegations that Defendant violated the Pennsylvania SIP or any Pennsylvania state law or regulation. Rather, the complaint alleges that Defendant violated the CAA by failing to obtain a Part D permit prior to constructing the landfill. *See* Complaint at ¶¶ 15–23.

15. *See National Mining Association v. U.S. E.P.A.,* 59 F.3d 1351 (D.C.Cir.1995), No. 95–

we disagree with Plaintiffs' assertion that they may invoke § 304(a)(3) of the federal Clean Air Act to enforce PADER's federally enforceability requirement. Section 304(a)(3) states:

> (a) Except as provided in subsection (b), any person may commence a civil action on his own behalf—
>
> *   *   *   *   *   *
>
> (3) against any person who proposes to construct or constructs any new or modified major emitting facility *without a permit required under Part C of title I* (relating to significant deterioration of air quality) *or Part D* (relating to nonattainment) or who is alleged to be in violation of any condition of such permit.

42 U.S.C. § 7604(a)(3) (emphasis added).

The statute is clear on its face. It permits challenges stemming from failure to obtain permits "required under" Part C or Part D of the CAA. After the *CMA* decision, "federal enforceability" is no longer the sine qua non for determining whether air pollution control equipment may be taken into account in assessing the need for a Part D preconstruction permit. As such, Plaintiffs are attempting to enforce a federal enforceability requirement that stems from Pennsylvania, not federal, law.

Following the Seventh Circuit's reasoning, we find § 304(a)(3) may not be used to enforce this federal enforceability requirement grounded in Pennsylvania law. *See Village of Oconomowoc Lake v. Dayton–Hudson Corp.*, 24 F.3d 962 (7th Cir.), *cert. denied*, — U.S. —, 115 S.Ct. 322, 130 L.Ed.2d 282 (1994) ("'Part D of Subchapter I' does not require Dayton Hudson to obtain a permit; any such requirement must come from Wisconsin law [Wisconsin's SIP] and therefore cannot serve as the foundation for suit under § 7604(a)(3)."). Section 304(a)(3) may only be used to enforce requirements found under Part C or Part D of the CAA. Plaintiffs should have proceeded under § 304(a)(1) if they wished to enforce the Pennsylvania SIP in federal court.[16]

## VI. PART D PERMIT REQUIREMENT

### A. *Regulatory Background*

Title I of the federal CAA comprehensively regulates stationary sources of air pollution. 42 U.S.C. § 7401 *et seq.* Pursuant to sections 108 and 109 of the CAA, the EPA sets national ambient air quality standards ("NAAQS") for air pollutants such as ozone, nitrogen oxides, carbon monoxide and particulate matter. 42 U.S.C. §§ 7408, 7409 (1988 & Supp. II 1990). Individual states then prepare a state implementation plan ("SIP") in an attempt to attain these air quality standards. 42 U.S.C. § 7410 (1988 & Supp. II 1990).

As one means for achieving and maintaining the NAAQS, Part D of Title I of the CAA requires preconstruction review for proposed pollutant sources located in geographic areas with air quality not in attainment with the NAAQS. 42 U.S.C. § 7501 *et seq.* A proposed stationary source in an ozone nonattainment area that has the "potential to emit" volatile organic compounds ("VOCs") in excess of the established "threshold" is considered a "major" source and thereby subject to EPA's Part D permitting requirements. 42 U.S.C. §§ 7511a(f) (1988 & Supp. II 1990); 40 C.F.R. § 165(a)(1)(iv)(B) (1994); *see* Stip. at ¶ 40.[17]

1006, Opposition to Petitioners' Motion to Enforce Mandate, Declaration of Mary D. Nichols, Assistant Administrator for the Office of Air and Radiation, November 29, 1995 ("EPA does not interpret the terms of the Court's decision [in *National Mining Association*] as affecting existing SIP provisions, based upon the now-vacated EPA regulations, which require that all limits credited as reducing a source's potential to emit be federally enforceable").

**16.** *See Delaware Valley Citizens Council v. Davis*, 932 F.2d 256 (3d. Cir.1991) (holding that aggrieved parties may enforce requirements of a SIP under § 304(a)(1) of the CAA); *see infra* note 25.

**17.** The EPA has established detailed preconstruction permitting requirements that a SIP must include to satisfy Part D. See 40 C.F.R. § 51.165 (1994), 40 C.F.R. § 52.24 (1994), and 40 C.F.R. Part 51, Appendix S (1994). These include the requirement that major source applicants (a) obtain sufficient "offsetting emissions reductions" from existing air pollution sources in the proposed project's geographic area; (b) demonstrate that the offsetting emissions reductions procured ensure that the nonattainment area make prog-

Berks County, the site of the Morgantown Landfill, lies within the Northeast Ozone Transport Region, an area not in attainment with the NAAQS for ozone. *See* 42 U.S.C. § 7511c(a); 40 C.F.R. 81.339 (1994); Stip. at ¶ 41. The threshold quantity for VOC emissions in Berks County is 50 tons per year or more. 42 U.S.C. § 7511c(b)(2); Stip. at ¶ 43. Any proposed stationary source in Berks County that has the "potential to emit" at least 50 tons per year of VOCs is therefore a "major" source and must obtain a CAA Part D permit. *Id.*[18]

The substance of the parties' dispute involves whether Defendant's Morgantown Landfill constitutes such a "major" stationary source—that is, whether it has the "potential to emit" at least 50 tons per year of VOCs—and was therefore constructed in violation of the CAA's Part D permit requirement.

*B. Interpreting "Potential to Emit"*

Given the D.C. Circuit's vacatur[19] of the EPA's Part D definition of "potential to emit" in the *CMA* decision, we look to the statute itself and relevant caselaw to determine whether the Morgantown Landfill's "potential to emit" exceeds the major source threshold for Berks County.

As we noted earlier, the Court's decision in *National Mining Association v. EPA,* 59 F.3d 1351 (D.C.Cir.1995), predated the *CMA* decision. In the *CMA* decision, the Court directed the EPA to reconsider its definition of potential to emit "in light of *National Mining Association.*" Defendant contends that after the *CMA* decision, federal caselaw provides two separate standards for evaluating a source's "potential to emit" VOCs. *See* Reply of Defendant to Plaintiffs' Opposition to Motion for Reconsideration at 18–21. Defendant argues that *National Mining Association* only governs assessment of operational restrictions on a source's potential to emit and that *Alabama Power v. Costle,* 636 F.2d 323, 353 (D.C.Cir.1979), would govern assessment of physical restrictions. Operational restrictions refer to things such as hours of operation and types of fuel, while physical restrictions usually refer to air pollution control equipment. We disagree with Defendant's position.

*National Mining Association* established a framework for evaluating operational as well as physical restrictions. The opinion makes clear that the court was dealing with both types of pollution controls. The Court specifically addressed whether the "EPA overstepped its regulatory authority by permitting a source to reduce its 'potential to emit' only with 'federally enforceable' **emission controls** and limitations." 59 F.3d at 1354 (emphasis added). In doing so, the court focussed on an EPA definition identical to the one at issue in the instant case:

> Any physical or operational limitation on the capacity of the stationary source to emit a pollutant, **including air pollution control equipment** and restrictions on hours of operation or on the type or amount of material combusted, stored, or processed, shall be treated as part of its design if the limitation or effect it would have on emissions is federally enforceable.

*Id.* at 1361–62 (quoting the EPA's CAA Title III definition of "potential to emit," a definition identical to EPA's Part D definition of "potential to emit") (emphasis added). The court's focus on this definition makes it clear that the opinion meant to provide a framework for evaluating both physical and operational restrictions.

If the court intended to limit its decision to only operational restrictions, it would have

ress toward complying with the applicable NAAQS and provide a net air quality benefit to the area; and (c) install air pollution control equipment to comply with the Lowest Achievable Emission Rate standard. 42 U.S.C. § 7503(a)(1)(A); *see also* 40 C.F.R. §§ 51.165(a)(2), (a)(3)(ii)(F) (1994).

18. Section 7511c(b)(2) states:

> any stationary source that emits or has the potential to emit at least 50 tons per year of volatile organic compounds shall be considered a major stationary source and be subject to the requirements which would be applicable to major stationary sources if the area were classified as a Moderate nonattainment area [among which is the requirement to obtain a Part D permit per CAA §§ 181(a)(2)(C)(i) and 182(b)].

42 U.S.C. § 7511c(b)(2).

19. *See supra* at ——.

said so explicitly. It did not. Moreover, had the D.C. Circuit in the *CMA* decision intended for there to be two separate standards for evaluating emission controls, it would have directed EPA to reconsider its definition of "potential to emit" in light of *National Mining Association* and *Alabama Power.* It did not.

*National Mining Association* held that in assessing a source's potential to emit, "effective" controls should be taken into account even if they are not federally enforceable. 59 F.3d at 1362. The court noted that the "EPA is clearly not obliged to take into account controls that are only chimeras and do not really restrain an operator from emitting pollution." *Id.* Rather, the court stressed the need for controls to be "unquestionably" and "demonstrably" effective in order to be taken into account. *Id.* at 1364. In addition, these controls must stem from state or local government regulations, and not from "operational restrictions that an owner might voluntarily adopt." *Id.* at 1362.

*C. Compliance With The 50 Ton Per Year Threshold*

We find that Defendant did not violate the CAA because after taking into account the Landfill's gas management system, the potential to emit VOCs falls below the 50 tons per year threshold. We include the gas management system's impact in making this calculation because we find it meets the standard set forth in *National Mining Association.* As described *supra,* there the court held that the controls must go beyond being merely effective, but must be more akin to "unquestionably" and "demonstrably" effective. 59 F.3d at 1364. In addition, these controls must stem from state or local government regulations, and not from "operational restrictions that an owner might voluntarily adopt." *Id.* at 1362.

Plaintiffs maintain that we must perform an ex ante evaluation of the gas management system, that is, an evaluation based on the status prior to the Landfill's construction. *See* Opposition at 15–18. Plaintiffs argue that under such an evaluation Defendant fails to satisfy the *National Mining Association* criteria, because at that point there was no basis from which to conclude that the gas management control system would be "unquestionably" and "demonstrably" effective in limiting VOC emissions to below 50 tons per year. *Id.* at 19–21.

We agree that a violation of the Part D permitting requirement occurs at the time of construction as the statute requires a preconstruction permit. *Cf. U.S. v. Louisiana–Pacific Corp.,* 682 F.Supp. 1122, 1130–31 (D.Colo.1987) (holding that "the violation of [Part C's preconstruction review requirements] occurs when the actual construction is commenced, and not at some later point in time" and that the subsequently-issued state permits "could not be a defense ... since they did not even exist when the alleged violation occurred"). Nonetheless, we disagree with Plaintiff's assertion that at the time of construction, "the only conclusion that could be drawn was that the Landfill's potential to emit VOCs exceeded 50 tons per year." *See* Plaintiff's Surreply Memorandum of Law in Opposition to Defendant's Motion for Reconsideration at 16.

At the time of construction, all the necessary data existed to compute that the gas management system will effectively limit the Landfill's VOC emissions to a quantity below the major source threshold. The parties stipulated that "an estimate of the quantity of NMOCs that will be produced by the Morgantown Landfill can be calculated by the EPA model **using data contained in New Morgan's Solid Waste Permit Application** and certain standard values developed by EPA." Stip. at ¶ 75 (emphasis added). Using this estimation process, Plaintiffs calculated that the maximum quantity of NMOCs/VOCs in the landfill gas that will be produced by the Landfill in any year is 663 tons. *Id.* at ¶ 76.[20]

The Landfill contains a gas collection and flare system (the "gas management system")

20. For present purposes, we will treat NMOC emissions as equivalent to VOC emissions. According to the EPA, NMOCs consist primarily of VOCs. 56 Fed.Reg. at 24473, *see* Stip. at ¶ 36. Although Defendant may dispute this, Stip. at ¶ 39, at a very minimum Defendant agrees that "NMOCs may conservatively be used as a proxy for VOCs." Defendant's Trial Brief at 32, n. 17.

that collects this landfill gas containing VOCs and processes it in a flare. *Id.* at ¶ 51. Defendant's **Air Quality Permit Application** stated that the gas management system will capture between 90% and 100% of the gas generated. *Id.* at ¶ 81. Nonetheless, we will assume 100% capturability in performing our computation. In their trial brief, Plaintiffs argued that the non-fugitive emissions calculation should assume the use of a gas collection system that captures 100% of the gas generated. *See* Plaintiff's Trial Brief at 30. Indeed, the parties apparently assumed 100% capturability in calculating that the maximum quantity of non-fugitive emissions would be 663 tons per year. *Id.*[21] We therefore similarly assume 100% capturability in calculating the quantity of gas that will make it into the flare for processing.

In its **Solid Waste Permit Application,** Defendant **"guaranteed"** that the flare would on average destroy over 99% of the NMOCs collected. *See* Stip. at ¶ 54 (emphasis added). Coupling this 99% destruction efficiency with a 100% landfill gas collection rate results in Landfill non-fugitive VOC emissions of at most 6.7 tons per year. *Id.* at ¶ 82. This falls well below the 50 tons per year threshold. Although Defendant did not make these calculations prior to construction, the necessary data existed to do so, as our highlights of the sources of the data we used illustrate.

In conclusion, computations performed now using data available at the time of construction demonstrate that Defendant's gas management system will be an effective form of pollution control equipment and limit the VOC emissions as required by law.[22]

Defendant's gas management system also satisfies *National Mining Association's* further requirement that in order for controls to be taken into account, they must stem from either state, local or federal government regulations. 59 F.3d at 1362. PADER issued a Solid Waste Permit to Defendant on June 24, 1992, authorizing the construction and operation of the Morgantown Landfill. Stip. at ¶ 62. The Solid Waste Permit "incorporate[d] by reference various documents comprising the approved Solid Waste Permit Application, **including but not limited to Form 26,** as permit conditions with which New Morgan [Defendant] is required to comply." *Id.* at ¶ 64 (emphasis added). The permit is thus a requirement of Pennsylvania law setting forth conditions with which Defendant must comply. *Id.* Defendant is not free to disregard these permit conditions.

Form 26 stated that the flare was "guaranteed to achieve an average NMOC destruction efficiency of over 99 percent." *Id.* at ¶ 54. As described above, if Defendant's gas management system operates at the 99% destruction efficiency required under the Solid Waste Permit, the VOC emissions will fall below the major source threshold for Berks

21. Indeed, if we did not assume 100% capturability, a source might easily underestimate its non-fugitive emissions by overestimating its fugitive emissions, thereby potentially evading CAA requirements.

22. Plaintiffs also challenge the gas management system's effectiveness based on the timing of its installation. *See* Opposition at 19–20. The Solid Waste Permit Application states that "actual construction of the collection and flaring system will be well into the future depending on waste disposal rates (TPD)." Stip. at ¶ 52. It also states that "[i]nstallation of the Landfill Gas Extraction System will occur in several phases, each commencing as new areas of the landfill are brought to final grade." Attachment 1 to Form 26 of the Solid Waste Permit Application. Plaintiffs argue that these statements constitute a lack of specificity regarding actual installation thereby calling into question the system's effectiveness. *See* Opposition at 19–20.

We believe PADER's approval regarding the timing of installation is insufficient to compel the conclusion that the gas management system will not effectively limit VOC emissions to below 50 tons per year. Statements in the permit application constitute conditions with which the permittee must comply with under Pennsylvania law. *See infra* at 877. Defendant is thus not free to install the gas management system whenever it pleases. Rather, Defendant must install the system as each area "of the landfill [is] brought to final grade." In assessing this issue we recognize the obvious practical reality that the rate at which a particular portion of a landfill fills up is uncertain. We also recognize that the anaerobic decomposition of waste within a landfill does not begin until after the waste has been in place for a period of time, no longer than two years. Stip. at ¶ 35.

County. As such, the permit constitutes a regulation required by state law that forces Defendant to limit its VOC emissions to below 50 tons per year.

*D. Impact of Fugitive Emissions*

We now address one last argument raised by Plaintiffs in the initial proceeding. Plaintiffs maintain that even taking into account the gas management system in quantifying the Landfill's emissions, Defendant still violated Part D of the CAA because the Landfill's combined flare (ie. non-fugitive) and fugitive emissions will exceed the 50 tons per year threshold. *See* Plaintiff's Trial Brief at 28, n. 17; Plaintiff's Reply Brief at 17, n. 11.

We disagree with Plaintiff's legal conclusion.[23] We believe fugitive emissions may not be counted in determining whether landfills are major sources for Part D permitting purposes. Section 302(j), entitled "definitions," instructs when fugitive emissions may be counted in determining what constitutes a major source. This section states:

> Except as otherwise expressly provided, the terms "major stationary source" and "major emitting facility" mean any stationary facility or source of air pollution which directly emits, or has the potential to emit, one hundred tons per year or more of any air pollutant (including any major emitting facility or source of fugitive emissions of any such pollutant, as determined by rule by the Administrator).

42 U.S.C. § 7602(j) (1988 & Supp. II 1990). Thus, under this section fugitive emissions may not be counted unless EPA has first conducted a rulemaking. *Alabama Power Co. v. Costle,* 636 F.2d 323, 369–370 (D.C.Cir. 1979).

Further, EPA's Part D regulations provide that "[t]he fugitive emissions of a stationary source shall not be included in determining ... whether it is a major stationary source unless the source ..." falls within a source category listed by formal rulemaking. 40 C.F.R. § 51.165(a)(1)(iv)(C) (1994). Despite listing several source categories in § 302(j) rulemakings, EPA has not listed landfills. Fugitive emissions from Defendant's Landfill may therefore not be counted in determining whether it meets the 50 tons per year threshold as EPA has not satisfied the § 302(j) rulemaking requirement.[24]

23. In its initial Air Quality Permit Application, Defendant estimated that the combined flare and fugitive emissions will exceed 50 tons per year. Stip. at ¶ 85. Although it is not part of the Stipulation, both parties acknowledge that Defendant's Revised Air Quality Permit Application stated that the combined flare and fugitive emissions will never exceed 47.5 tons per year. *See* Plaintiff's Reply Brief at 17, n. 11; Defendant's Trial Brief at 40–41. Plaintiffs argue in their brief that we should find that Defendant "massag[ed]" the data in order to avoid Part D permitting requirements. Plaintiff's Reply Brief at 17, n. 11. Obviously if the Revised Application is correct, the Landfill's emissions will not exceed 50 tons per year and the Landfill would therefore not be a "major source" for Part D permitting purposes, regardless of our legal conclusion about fugitive emissions. Because the Revised Application is not part of the Stipulation, however, we decline to consider it at this time.

24. Plaintiffs claim that EPA's adoption of Pennsylvania's SIP, which aggregates stack and fugitive emissions, constitutes a rulemaking for § 302(j) purposes and therefore Defendant's fugitive emissions must be taken into account in assessing its potential to emit VOCs. Plaintiff's Reply Brief at 17, n. 11. Plaintiffs rely on *Duquesne Light Co. v. EPA,* 698 F.2d 456 (D.C.Cir. 1983) for support. *Duquesne Light* upheld EPA's decision to include fugitive emissions in defining "potential to emit" in its section 120 noncompliance penalty program regulations. This definition states:

> "Potential to emit" means ... Fugitive emissions ... will be considered in determining annual potential for those stationary sources whose fugitive emissions are regulated by the applicable state implementation plan.

40 C.F.R. § 66.3(j) (1981). The court found that EPA's initial adoption of the SIP and subsequent reliance on it in deciding to include fugitive emissions in the definition of "potential to emit" satisfied the § 302(j) rulemaking requirement. *Duquesne Light,* 698 F.2d at 474–75.

In the instant case, EPA's definition of "potential to emit" for Part D permitting purposes makes no mention of fugitive emissions. 40 C.F.R. § 51.165(a)(1)(iii). Moreover, the regulations provide that "[t]he fugitive emissions of a stationary source shall not be included in determining ... whether it is a major stationary source, unless the source ..." falls within a source category listed by formal rulemaking. 40 C.F.R. § 51.165(a)(1)(iv)(C) (1994). As such, the fact that EPA adopted Pennsylvania's SIP which aggregates fugitive and flare emissions is irrelevant here.

## VII. ALLEGATIONS UNDER § 304(a)(1)

In their Motion for Reconsideration, Plaintiffs now attempt to maintain for the first time that Defendant also violated several parts of the Pennsylvania SIP and that these violations are actionable under § 304(a)(1).[25] *See* Opposition at 25–35. Plaintiffs admit that they never alleged a violation of § 304(a)(1) in the Complaint and that they have not satisfied the 60 day notice requirement of § 304(a)(1). *Id.* at 34. Nonetheless, they request that we retain jurisdiction and permit Plaintiffs to satisfy the 60 day notice requirement. *Id.* at 35.

We deny Plaintiffs' request. Up until this time Plaintiffs have been proceeding exclusively under § 304(a)(3) alleging violations of Part D of the CAA. *See supra* note 14. The footnote to our Court Order of April 20, 1995, expressly invited the parties to "develop a stipulated statement of facts which may be submitted to the court for a non-jury determination of this matter." Our Order contemplated a trial and final decision on the merits. The parties submitted such a stipulation which noted that it was being submitted in response to the Court's April 21, 1995, Order. The stipulation also provided that in rendering its non-jury determination, the Court could review and rely upon the stipulation and various materials referred to in Exhibit A to the stipulation. We are rendering a final decision on the merits and in doing so we have just completed a lengthy, complicated, and extremely costly non-jury trial on Plaintiffs' § 304(a)(3) claims. There must be an end to all things and offering these never before asserted allegations at this late point in time is not only astounding to us, but also borders on harassment and runs the risk of Rule 11 sanctions.

## VII. CONCLUSION

For the foregoing reasons, we conclude this court has jurisdiction to hear the § 304(a)(3) claims; the Individual Plaintiffs lack standing to maintain this action; the Corporate Plaintiffs have standing to bring this action; the Plaintiffs' motion for reconsideration was timely; this Court lacks jurisdiction under § 304(a)(3) to hear the claims grounded in the Pennsylvania SIP's "federal enforceability" requirement; the Defendant did not violate the CAA; and that it is inappropriate for this Court to retain jurisdiction over this matter so as to allow Plaintiffs to satisfy the 60 day notice requirement for bringing a § 304(a)(1) claim.

An appropriate order follows.

### *ORDER*

**AND NOW,** this 8th day of January, 1996, after full consideration of the parties' Joint Pretrial Stipulation, filed on June 16, 1995, Plaintiffs' trial brief, filed on July 14, 1995, Defendant's trial brief, filed on August 11, 1995, Plaintiffs' reply brief, filed on August 25, 1995, Defendant's surreply brief, filed on September 15, 1995, Defendant's Motion for Reconsideration and Memorandum of Law in Support, filed October 5, 1995, Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Reconsideration, filed October 18, 1995, Defendant's Reply to Plaintiffs'

Under *Duquesne Light* only if EPA had relied on the SIP in defining "potential to emit" would EPA's adoption of the SIP constitute a rulemaking sufficient for § 302(j) purposes.

25. Section 304(a)(1) of the CAA states:

> (a) Except as provided in subsection (b), any person may commence a civil action on his own behalf—
>
> (1) against any person (including ... any ... governmental instrumentality or agency to the extent permitted by the Eleventh Amendment to the Constitution) who is alleged to be in violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation, ...

42 U.S.C. § 7604(a)(1).

Section 304(f) defines "emission standard or limitation" as:

> [a]ny other standard, limitation or schedule established under any permit issued pursuant to subchapter V of this chapter **or under any applicable State implementation plan approved by the Administrator,** ... which is in effect under this chapter ... or under an applicable implementation plan."

42 U.S.C. § 7604(f) (emphasis added). Section 7604(a)(1) thus permits aggrieved parties to bring a citizen suit alleging that a polluter is in violation of Pennsylvania's state implementation plan. *See Delaware Valley Citizens Council v. Davis,* 932 F.2d 256 (3d. Cir.1991). Plaintiffs proceeding under § 7604(a)(1) must give 60 days' notice to the potential defendant. 42 U.S.C. § 7604(b).

Opposition, filed October 25, 1995, and Plaintiffs' Surreply Memorandum of Law in Opposition, filed November 7, 1995, it is hereby **ORDERED** consistent with the foregoing Decision as follows:

(1) that our prior September 21, 1995, Decision and Order is hereby **WITHDRAWN** and **REPLACED** with the foregoing Decision and this Order;

(2) that Judgment is hereby entered in favor of **Defendant** New Morgan Landfill Company, Inc., **and against Plaintiffs** John Snyder, Jeffrey R. Horowitz, Ogden Projects, Inc., and Ogden Martin Systems of Lancaster, Inc.;

(3) This case is **CLOSED** for administrative purposes.